UNITED STATES of America

v.

Biagio DIGIACOMO, Vincent C. Gioac-
chini, a/k/a Dee Dee Antonio L. Spag-
nolo, a/k/a Anthony, a/k/a Spucky.

Crim. No. 90–10065–Wf.

United States District Court,
D. Massachusetts.

July 5, 1990.

Supplemental Order Aug. 3, 1990.

Ernest DiNisco, R. Bradford Bailey, U.S. Atty's. Office, Dist. of Mass., Boston, Mass., for the U.S.

Richard M. Egbert, Boston, Mass., for DiGiacomo.

Joseph J. Bulliro, Boston, Mass., for Spagnolo.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

This case arises from an impressive undercover operation conducted by the Federal Bureau of Investigation ("FBI") from 1983 to 1987, and from the apparently unprecedented electronic surveillance of a La Cosa Nostra ("LCN") or Mafia induction ceremony on October 29, 1989. The evidence preliminarily indicates that the defendant Biagio DiGiacomo is a "Capo Regime," or "Captain," in the alleged Patriarca family of the LCN. It appears that the defendant Anthony "Spucky" Spagnolo is a "Soldier" in that family.

In February, 1987 DiGiacomo and Spagnolo were informed by the FBI that for several years their criminal conversations and conduct with undercover Special Agent Vincent delaMontaigne had been surreptitiously tape-recorded. This disclosure was made in an unsuccessful effort to obtain their cooperation in the investigation of other, presumably more important, LCN figures.

Over 3 years later, on March 26, 1990, DiGiacomo, Spagnolo, and their co-defendant Vincent Gioacchini were arrested on the charges in this case. On the same day several of their alleged superiors in the Patriarca family were arrested in another case now pending in this District. *United States v. Patriarca, et al.*, Cr. No. 89-28-MA (the "Patriarca case"). Also on the same day, 10 other alleged members of the

Patriarca family were arrested in the District of Connecticut. *United States v. Bianco, et al.,* Cr. No. H–90–18(AHN) (the "Bianco case").

In contrast to certain defendants in the Patriarca and Bianco cases, neither DiGiacomo nor Spagnolo is alleged to have committed a murder or conspired to have committed a murder.[1] Although each case is unique, 8 of the 10 defendants in the Bianco case, including alleged "Underboss" Nicholas Bianco (who would be superior to DiGiacomo) and alleged Capo Matthew Guglielmetti, have been released pending trial.[2]

On April 6, 1990, the magistrate ordered DiGiacomo and Spagnolo detained, finding that no combination of conditions of release would reasonably assure their appearance or the safety of the community. In reaching her decision regarding detention, the magistrate relied substantially on information contained in the April 2, 1990 Affidavit of FBI Special Agent Joseph P. Hannigan, Jr. and related testimony.

DiGiacomo and Spagnolo requested that this court review the matter of their detention.[3] This review, however, was delayed in part because although the undercover operation had been completed for over three years, the government had not prepared even preliminary transcripts of the tape recordings relating to Hannigan's affi-

davit or other relevant transcripts. Preliminary transcripts of the recordings relating to the Hannigan affidavit were produced on June 8, 1990. Additional transcripts were made available to the defendants on June 22, 1990.

After receiving memoranda of law from the parties, from June 25 to June 29, 1990, the court conducted further evidentiary hearings concerning the detention of DiGiacomo and Spagnolo. In view of the overlap in some of the charges and evidence, it was agreed that a joint hearing would be appropriate, with the understanding that the court would analyze the evidence with regard to each defendant individually. The evidence now before this court includes all of the testimony and other evidence presented to the magistrate, additional testimony of Special Agents Hannigan and delaMontaigne, the testimony of Anthony Spagnolo's brother Vincent, various transcripts of tape-recorded conversations, and other documents.

The court has independently reviewed the foregoing evidence. For the reasons described in this opinion, the court concludes that with regard to each defendant the government has not satisfied its burden of proving that no combination of conditions will reasonably assure the appearance of the defendant, the safety of any person, or the safety to the community. Rather,

1. The indictment in this case charges DiGiacomo with violations of 18 U.S.C. § 1962(d) (Racketeering Influenced and Corrupt Organizations ("RICO") conspiracy); 18 U.S.C. §§ 1962(c) and 2 (RICO substantive); 21 U.S.C. §§ 846, 841(a)(1), and 18 U.S.C. § 2 (possession and distribution of narcotics and conspiracy); 18 U.S.C. §§ 894(a), 892(a), and 2 (extortionate credit transactions); 18 U.S.C. §§ 1953, 1955, and 2 (illegal gambling); 18 U.S.C. § 1951 (extortion, Hobbs Act); Mass.Gen.L. ch. 265, § 25 (extortion); 18 U.S.C. §§ 1503, 1622, and 2 (subornation of perjury and obstruction of justice); 18 U.S.C. §§ 1343, 1341, 1029(a), and 2 (mail and wire fraud); 18 U.S.C. §§ 1029(a) and (counterfeit access devices); 18 U.S.C. §§ 1952 and 2 (interstate travel in aid of racketeering); 18 U.S.C. § 371 (conspiracy).

Spagnolo is charged with violations of 18 U.S.C. § 1962(d) (RICO conspiracy); 18 U.S.C. §§ 1962(c) and 2 (RICO substantive); 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. § 2 (conspiracy to possess and distribute narcotics); 18 U.S.C.

§§ 894(a) and 2 (extortionate credit transactions); 18 U.S.C. §§ 1953 and 2 (interstate and transportation and gambling paraphernalia); 18 U.S.C. §§ 1953, 1955, and 2 (illegal gambling); 18 U.S.C. § 1951 (extortion, Hobbs Act); 18 U.S.C. §§ 1341, 1343, 1952, 1029(a) and 2, and 21 U.S.C. § 843(b) (mail fraud and wire fraud); 18 U.S.C. §§ 1029(a) and 2 (counterfeit access devices); 21 U.S.C. §§ 843(b), 18 U.S.C. § 2 (use of a telephone to further a drug conspiracy); 18 U.S.C. §§ 1952 and 2 (interstate travel in aid of racketeering); and 18 U.S.C. § 371 (conspiracy).

2. Bianco and Guglielmetti have been released on terms which are less restrictive than those which will be imposed upon DiGiacomo and Spagnolo upon their release pursuant to this Memorandum and Order.

3. Co-defendant Vincent Gioacchini has also been detained. Because of his desire to change counsel, his detention has not yet been reviewed.

the court concludes that there are a combination of conditions which will provide the required reasonable assurances. These conditions include, but are not limited to, requiring that each defendant remain at home subject to electronic monitoring and permitting them to meet or communicate only with their attorneys, members of their families, and a small number of close friends not associated with the Mafia.

The reasons for this decision are many. They are described in detail below. At the outset, however, it should be noted that the government has failed to prove that either DiGiacomo or Spagnolo is likely to flee if released in part because each of them for three years knew there was substantial evidence of the likely charges against them and did not attempt to flee before indictment.

Similarly, the government has failed to prove that the conditions to be imposed by the court will not reasonably assure the safety of any person or the community in part because of its conduct in the three years prior to the return of the indictment in this case. More specifically, while the court understands that some time after the conclusion of an undercover phase of an investigation is necessary to conduct related overt investigation and to prepare a case for indictment, it is evident that the government was not greatly concerned by the risk of flight or danger presented by DiGiacomo or Spagnolo after they were informed in February, 1987 of the undercover operation. Since February, 1987, the defendants have not been under surveillance. In addition, as the problem with producing the preliminary transcripts, among other things, suggests, the government did not in those three years feel an urgent need to secure the indictment and seek the pretrial incarceration of DiGiacomo and Spagnolo. Rather, it appears that the extraordinary event of the electronically surveilled induction ceremony triggered the indictments of these defendants' alleged LCN superiors and precipitated the prosecution of DiGiacomo and Spagnolo as well.

The court's view that the government has not proven that the pretrial detention of DiGiacomo and Spagnolo is warranted is reinforced by its perception of the defendants as calculating individuals. As described below, it appears that the defendants have long known the government had substantial evidence of their membership in the Mafia and of their involvement in many of the crimes for which they are now charged. It has also been foreseeable that conviction on such charges would probably result in meaningful terms of incarceration for each of them. This is a risk the defendants apparently decided to accept by not fleeing in the past three years. As the court stated in the course of the detention hearings, however, in view of defendants' dismal history of being successfully investigated by the FBI, it should also now be foreseeable that if they attempt to violate the conditions of their release they will again be caught and, if ultimately convicted, they will be subject to substantially enhanced penalties. It should be particularly evident that any direct or indirect effort by DiGiacomo or Spagnolo to attempt to obstruct justice or intimidate a witness while on release will not only result in the revocation of bail, but also substantially increase their sentences if they are convicted in this case. The court expects that at this point DiGiacomo and Spagnolo will recognize that the risk of a further serious sentence is unnecessary and unacceptable.

## II. THE APPLICABLE LEGAL STANDARDS

■ It is necessary to consider the pretrial detention of DiGiacomo and Spagnolo because this is a case in which each is charged with both crimes of violence and offenses for which a maximum term of imprisonment of ten years or more is prescribed by the Controlled Substances Act. 18 U.S.C. § 3142(f)(1)(A) and (C).

■ With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure each defendant's appear-

ance at future court proceedings. *United States v. Vortis*, 785 F.2d 327, 328–29 (D.C. Cir.), *cert. denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986).

■ With regard to danger, however, there is a heightened standard of proof because of "the importance of the interests of the defendant which are implicated in a pretrial detention hearing." S.Rep. No. 225, 98th Cong., 2d Sess. 22, *reprinted* in 1984 U.S.Code Cong. & Admin.News 3182, 3205. Thus, clear and convincing evidence is required to establish the facts relied upon to support a finding that no combination of conditions will reasonably assure the safety of any other person or the community. 18 U.S.C. § 3142(f).

In addition, as Judge Robert Keeton has recently observed:

> Congress ... [chose] to use the term "danger" which by its nature is a risk concept. By using this term, Congress did not declare that the community is entitled to assurances of freedom from all harm, and a court cannot detain arrestees on the mere apprehension of danger of harm. Rather, the court's inquiry must focus on whether by conditions of release the community can *reasonably* be assured of its safety. *See United States v. Orta*, 760 F.2d 887, 892 (8th Cir.1985) (en banc).

*United States v. Phillips*, 732 F.Supp. 255, 266 (D.Mass.1990) (emphasis in original).

■ Generally, when reviewing a magistrate's order regarding pretrial detention, it is the duty of the district court to "undertake an *independent* review of the[ ] case[ ]." *United States v. Hurtado*, 779 F.2d 1467, 1480 (1985), *reh'g denied*, 788 F.2d 1570 (11th Cir.1986) (emphasis in original); *Phillips*, 732 F.Supp. at 259. An independent review and analysis of all of the evidence is particularly appropriate here because this court has received considerably more information than was presented to the magistrate.

■ As DiGiacomo and Spagnolo are each charged with violations of the Controlled Substances Act (21 U.S.C. § 801 *et seq.*) for which there is a maximum penalty of more than ten years, there is in this case a rebuttable presumption that no combination of conditions will reasonably assure their appearance or the safety of the community. 18 U.S.C. § 3142(e). This, however, simply requires the defendants to produce some evidence to rebut the presumptions. *United States v. Jessup*, 757 F.2d 378, 381–82 (1st Cir.1985). They have done so. The burden of persuasion remains with the government with regard to the questions of flight and danger. *Id.* at 383–84. The court, however, must still consider as weighing in favor of detention the fact that Congress found that alleged drug traffickers generally pose special risks of flight and danger to the community. *Id.* at 384. Nonetheless, the court "may still conclude that what is true in general is not true in the particular case before [it]." *Id.; United States v. Perez–Franco*, 839 F.2d 867, 870 (1st Cir.1988).

Along with the rebuttable presumptions, the court must also consider the following factors in determining whether detention is warranted:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether at the time of the current offense or arrest, the person was on probation, or parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community

that would be posed by the person's release.

18 U.S.C. § 3142(g).

■ With regard to the foregoing factors, it is appropriate for the court to consider the evidence of DiGiacomo's and Spagnolo's membership in the Mafia as a factor militating in favor of detention. *See e.g., United States v. Zannino*, 798 F.2d 544, 547 (1st Cir.1986); *United States v. Accetturo*, 783 F.2d 382, 384–85 (3rd Cir. 1986); *United States v. Colombo*, 777 F.2d 96, 99 (2d Cir.1985). Membership in the Mafia, however, cannot properly be the end of the inquiry with regard to dangerousness or flight. Among other things, a defendant's role in the Mafia is relevant because leaders or individuals with the ability to direct the criminal activity of others pose a special threat to the safety of the community. *See, Zannino*, 798 F.2d at 547 ("Zannino played a continuing leadership role in mob activities.... directing illegal activities through communications with associates"); *Accetturo*, 783 F.2d at 384 (Accetturo "headed" a "well-run criminal organization"); *Colombo*, 777 F.2d at 99 ("Colombo was the leader of an enterprise that carried out its criminal activities at his direction ... orchestrating a series of violent criminal operations"). In addition, accepting that Mafia membership at any level inherently entails a degree of dangerousness and, because of the far-flung nature of the organization, special risks of flight, the court must nevertheless consider whether there is a combination of conditions which can reasonably protect against the danger posed, directly or indirectly, by the particular defendant and reasonably assure that individual's appearance in court.

■ The court has also considered whether the prospect of protracted pretrial detention is a factor which may properly be considered as weighing in favor of release. This question is presented because the defendants have already been incarcerated for about four months and their trial is not expected to be completed for another year. It is, however, "the Speedy Trial Act, 18 U.S.C. 3161 *et seq.*, not the preventive detention provision of the Bail Reform Act

[that] is the vehicle chosen by Congress to regulate the length of pretrial delays for both detained and undetained defendants." *Accetturo*, 783 F.2d at 387; *Colombo*, 777 F.2d at 100 ("Congress ... relied on the Speedy Trial Act to limit the period of pretrial incarceration."). In some circumstances protracted pretrial detention may violate a defendant's right to due process. *Zannino*, 798 F.2d at 547. That has not yet occurred in this case. *Id.* Therefore, the court concludes that it would not be appropriate to deem the inevitability of prolonged pretrial detention as a consideration weighing in favor of release. The court has not done so. Understanding that continued detention would likely be lengthy, however, has reinforced the court's usual interest in carefully considering whether the evidence concerning the factors which are relevant proves that each defendant should be detained.

■ Similarly, the court has not considered as a factor favoring release defendants' claim that because there is not a federal pretrial detention center which is easily accessible to Boston, Massachusetts they should be released in order to facilitate consultation with their counsel in this complex case. There is a serious problem in this district relating to the facilities for pretrial detention. DiGiacomo and Spagnolo have been incarcerated in Danbury, Connecticut, which is a more than four hour drive from Boston. While the government has temporarily moved them to the Plymouth County Jail, which is closer to Boston, defendants' object to the adequacy of the Jail for the purpose of long term incarceration. At some point a serious question concerning whether defendants are being denied their right to effective assistance of counsel might be generated by problems relating to the place or manner of their pretrial detention. The court is not now presented with this constitutional question. As with the length of detention, the court does not regard the unavailability of a suitable federal pretrial detention facility in this area to be a factor to be considered in assessing the propriety of pretrial detention. Once again, however, this issue mag-

nifies the importance of carefully considering whether the relevant factors indicate detention is warranted. In this case, the release of the defendants which the court finds is otherwise justified should have the incidental, favorable effect of facilitating the fair and efficient preparation of defendants' case for trial, and thus serve the interests of the administration of justice.

## III. THE UNDERCOVER OPERATION

Beginning in late 1983, Special Agent delaMontaigne rented a store several doors away from the Roma Restaurant which DiGiacomo owned and ran in East Boston. After frequenting the Roma and successfully conveying the impression that he was a criminal who, among other things, dealt cocaine, delaMontaigne became DiGiacomo's close companion. delaMontaigne and DiGiacomo were together three or four times a week for several years. Spagnolo was among DiGiacomo's associates whom delaMontaigne met in that period. As an undercover operative, delaMontaigne engaged in several crimes with DiGiacomo and/or Spagnolo.

At one point, DiGiacomo undertook to introduce delaMontaigne to a local source of cocaine, Nicholas Rosato. DiGiacomo characterized this as a "favor" he was doing for his friend, delaMontaigne. DiGiacomo told delaMontaigne he did not expect any payment concerning delaMontaigne's dealings with Rosato. Rather, not knowing he was being tape recorded, DiGiacomo asserted that he refused to get involved with drugs because of his family and reputation. Nevertheless, the evidence indicates that DiGiacomo participated in negotiations to purchase kilograms of cocaine, sought to obtain a better price for delaMontaigne, financed Rosato's drug dealings by lending him money at the rate of 3% interest per week, and unsuccessfully sought a source of heroin for delaMontaigne.

delaMontaigne also observed DiGiacomo receive payments at the Roma from what he understood were loansharking activities. In addition, from November, 1986 to January, 1987, delaMontaigne, DiGiacomo, and Spagnolo were partners in conducting illegal poker games. They ceased this activity after earning $120 for their final month's effort, of which $30 was paid to DiGiacomo and $30 was paid to Spagnolo.

During their association, DiGiacomo told delaMontaigne of several instances in which he had engaged in violence, alone or with associates. In one instance DiGiacomo reported threatening a former boxer with a gun. In another instance, which apparently occurred in the early 1970s, DiGiacomo claimed to get his associates to join him in beating someone with a baseball bat as a result of a traffic incident. delaMontaigne heard DiGiacomo ask a young man to commit a murder for him, a request which DiGiacomo later explained was intended to test the young man's response. DiGiacomo also asked delaMontaigne if he could get him a "clean" (untraceable) gun. delaMontaigne, however, never saw DiGiacomo become violent or possess a weapon.

DiGiacomo informed delaMontaigne that he had recently risen in the ranks of the local Mafia; he apparently became a Capo in the Patriarca family in 1986. However, delaMontaigne also observed DiGiacomo cooking and working at the Roma, sometimes 7 days a week. The restaurant was, in part, intended to provide the appearance of a legitimate source for DiGiacomo's illegal income. Yet shortly before the undercover operation surfaced, DiGiacomo told delaMontaigne that he could not afford new clothes or a new car.

Spagnolo was introduced to delaMontaigne by DiGiacomo. Spagnolo borrowed $35,000 from delaMontaigne to buy marijuana from a source in Ohio. Spagnolo hoped the deal would provide "Christmas money." He was, however, unable to raise the funds quickly enough to consummate the deal. Thus, he returned the $35,000 to delaMontaigne.

Spagnolo asked delaMontaigne to get him a substantial source of cocaine, but did not appear to have his own source. He did say he could get some "Thai sticks," a potent form of marijuana.

Late one evening, delaMontaigne saw Spagnolo pull a knife with a 12 inch blade

in a bar after one of the patron's antagonized him. He did not, however, confront that person. Rather, he was persuaded by his colleagues to put the knife away.

Spagnolo supplied delaMontaigne with stolen credit cards. As indicated earlier, they also became partners in an illegal poker game. In January, 1987, after receiving $30 for the last month of this venture, Spagnolo was disturbed. He had previously complained that business was bad because "things are tough in the Mafia." On this occasion he stuffed the $30 in his mouth and threatened to return to making money the "old way"—by pulling "kids out of their sneakers" and stealing their money.

By late January, 1987, the FBI had decided to terminate delaMontaigne's undercover operation. According to delaMontaigne, at this point it did not appear that the cost of continuing the operation would be worth the investment. Rather, a decision was made to confront DiGiacomo and Spagnolo with the fact that they had been targets of a successful undercover operation, warn them not to threaten or harm delaMontaigne or his family, and seek their cooperation in the investigation of other LCN figures. This was done in February, 1987.

Since February, 1987, DiGiacomo and Spagnolo have each known that their contacts with delaMontaigne were continuously tape-recorded. In February, 1987, and thereafter, the FBI told the defendants of the serious charges—including RICO and drug charges—it expected to prove against them as part of an unsuccessful effort to persuade DiGiacomo and Spagnolo to cooperate with the FBI's continuing investigation of organized crime. DiGiacomo consulted counsel, who contacted the government and offered to surrender his client when he was indicted. Spagnolo asked delaMontaigne from time to time when he would be arrested.

Spagnolo and DiGiacomo continued to see delaMontaigne occasionally. Neither defendant, nor anyone else, has threatened delaMontaigne or his family. Nor has either defendant attempted to flee Massachusetts.

■ According to delaMontaigne, after DiGiacomo and Spagnolo were confronted, the FBI decided that incapacitating them was not an urgent matter. Although each was occasionally observed in the course of the FBI's other activities, neither was placed under surveillance. Similarly, although some overt investigation relating to DiGiacomo and Spagnolo was conducted, delaMontaigne worked on other matters which were given higher priority. The court infers that if the government had since 1987 considered DiGiacomo or Spagnolo to have presented a serious threat of flight or, particularly, a significant danger to the community, it would have given more urgent attention to completing its investigation and indicting this case in order to secure the defendants' detention.

In October, 1989, the FBI obtained a warrant to tape-record a Mafia induction ceremony, apparently for the first time. The evidence indicates that on October 29, 1989, many members of the alleged Patriarca family, including DiGiacomo and Spagnolo, met at a residence in Medford, Massachusetts to induct new members. Much of the approximately six hours of discussion relates to subjects such as the placement of the figs, nuts, and other food. DiGiacomo, however, conducted the induction ceremony.

It is evident by their presence at the ceremony that DiGiacomo and Spagnolo were by October 29, 1989, already "made members" of the Mafia. DiGiacomo is identified as a Capo, and thus a person who must be obeyed by those below him in the organization. The court infers that DiGiacomo and Spagnolo, like the October 29, 1989 inductees, have sworn their life-long, paramount loyalty to the Mafia and, explicitly or implicitly, undertaken to kill even a close family member who informed on the Mafia if instructed to do so; indeed, DiGiacomo was recorded giving such an instruction to one inductee.

On March 26, 1990, arrests were made in three cases relating to the Patriarca family and the October 29, 1989 ceremony. Among those arrested in the two other cases are Raymond Patriarca (the alleged

"Boss" of the family), Nicholas Bianco (an alleged Underboss), Joseph Russo (the alleged "Consigliere" or "Counselor" and an alleged *de facto* Underboss), Vincent Ferrara and Matthew Gugliemetti (each an alleged Capo Regime).

With regard to this case, DiGiacomo was arrested at home, without incident. After learning that the FBI was looking for him, Spagnolo returned to the vicinity of his home and waited to be arrested.

## IV. THE STATUTORY FACTORS

### A. *DiGiacomo*

In addition to the foregoing information relating to the undercover operation, the evidence relating to DiGiacomo concerning the factors that must be considered pursuant to 18 U.S.C. § 3142(g) include the following.

DiGiacomo is charged with committing crimes of violence, such as extortion and loansharking, and narcotics offenses, among other things. In addition, the essence of the RICO charge is that DiGiacomo is an official of the Mafia, an enterprise which engages in violence, intimidation of witnesses, and murder in the regular course of its illegal business. DiGiacomo is also charged with attempting to obstruct justice by soliciting false testimony in connection with investigations concerning other individuals.

The undercover operation generated consensually monitored tape recordings which seem to constitute strong evidence of the drug and loansharking offenses with which DiGiacomo is charged. However, in view of DiGiacomo's recorded statements to the effect that he was not interested in being involved in drug transactions but only doing delaMontaigne a favor, at this preliminary point there appears to be adequate evidence of a lack of predisposition to require a jury to consider the question of entrapment with regard to some of the drug charges against him. Although the validity of the Title III surveillance of the induction ceremony has not been litigated, at this point the recordings appear to be clear and convincing evidence that DiGiacomo is a Capo in the Mafia, an organization whose members swear to kill informants if so directed.

DiGiacomo is 43 years old, was born in Sicily, and continues to have family there. However, his family and his wife's family, the Caramazzas, are engaged in a bloody vendetta against each other in Sicily. Evidently because of this, DiGiacomo did not travel to Italy to visit his dying mother or to attend her wake. The government has not presented clear and convincing evidence to establish that DiGiacomo conspired to commit murders in Sicily. Rather, an Italian magistrate has recommended that he be removed as a suspect in the pending murder investigations.

DiGiacomo has lived in this community for over twenty years. The record is replete with letters from friends who commend him as a hard worker in his restaurant and as dedicated to his wife and three children, particularly his youngest son who is now 20 months old. A letter from one of his sons confirms this.

DiGiacomo appears to have substantial equity in several buildings, as well as the Roma Restaurant. He has no history of drug or alcohol abuse. He also has no criminal record. Thus, he was not under judicial supervision when he allegedly committed the offenses involved in this case.

In addition, DiGiacomo turned in his guns to the Boston police when his license to carry them was revoked. This suggests that DiGiacomo is capable of satisfying his legal obligations if he perceives that it is in his interest to do so.

In contrast to the foregoing factors, the evidence is compelling that DiGiacomo is a long-time "made member" of the Mafia, who was promoted to Capo in 1986 when the successful prosecution of key New England LCN figures created vacancies in the organization's hierarchy. The evidence also suggests that DiGiacomo participated in hiding Joseph Russo in Montreal when Russo was apprehensive about his possible indictment. DiGiacomo himself claimed that if there was taped evidence that he had participated in a murder he would flee. DiGiacomo unsuccessfully urged Vincent

Ferrara, the alleged Patriarca family Capo now charged with murder in the Patriarca case, to flee before his indictment.

With regard to the Mafia generally, the evidence indicates that some members and associates have fled when released prior to trial. Others, however, have been released and appeared as required. Among those successfully released before trial, and indeed after trial, were Peter Limone and Richard Gambale, who were convicted of attempting to obstruct justice by conspiring to murder Walter LaFreniere.

As indicated earlier, there is formidable evidence that the Patriarca family has historically been willing to use violence and to attempt to obstruct justice. Gennaro Anguilo directed criminal activity while imprisoned. Ilario Zannino did the same while under house arrest. DiGiacomo is now an official of the LCN family they previously led.

### B. Spagnolo

Like DiGiacomo, Spagnolo is charged with committing crimes of violence and narcotics offenses, as well as other offenses. The evidence indicates he is a Soldier in the Mafia. Spagnolo is not accused of personally participating in attempts to obstruct justice.

Although he was not a very active participant in the October 29, 1989 induction ceremony, Spagnolo's presence at that event constitutes compelling evidence of his involvement in the Mafia. The consensual recordings developed by delaMontaigne provide strong evidence of many of the various crimes alleged in the indictment. These include the drug charges against Spagnolo, as to which there does not appear to be a basis for an entrapment defense. Nevertheless, the evidence indicates that Spagnolo had little success in his efforts to operate as a drug dealer.

Spagnolo is 48 years old. He has lived in this community all of his life. He has usually resided in a triple decker in Revere owned by his now deceased mother. Although he is divorced, numerous letters indicate that Spagnolo is very close to his five siblings and many nieces and nephews in the Boston area. He did, however, travel to Italy many years ago. It also appears that he may have visited Joseph Russo when he was hiding in Montreal.

Spagnolo has no known financial resources and, judging from his lifestyle and comments to delaMontaigne, none of which are undisclosed. His brother Vincent, however, is an upstanding member of the community who is willing to pledge his home (in which he has about $200,000 in equity) and his mother's former home to assure his brother's appearance at future proceedings.

Spagnolo has a record of arrests dating back to 1959. The charges range from drunkenness to armed robbery, on which he was found not guilty. The record does not indicate that Spagnolo ever failed to appear as required in connection with any charge. Nor was he under judicial supervision when charged in this case.

The court has considered with particular care the evidence relating to the alleged specific instances of Spagnolo's dangerousness.[4] The court's assessment of this evidence includes, but is not limited to, the following.

There is not clear and convincing evidence that Spagnolo has participated in murder for the LCN. As the testimony relating to the sealed portion of paragraph 37 of Hannigan's April 3, 1990 affidavit indicated, there is information suggesting that Spagnolo may have been involved in the LCN shooting of Joseph Barboza, a government witness. However, while others have been previously prosecuted, and Joseph Russo is now being prosecuted, for Barboza's murder, Spagnolo has not been charged. While this does not necessarily mean that Spagnolo was not also involved, it does suggest that the evidence concerning Spagnolo's participation in the Barboza

**4.** Notwithstanding defendants' objection, the court has read the affidavit of Special Agent Joseph P. Hannigan, Jr. dated June 22, 1990, submitted in camera, concerning the confidential informants relied upon in Hannigan's original affidavit. See United States v. Acevedo–Ramos, 755 F.2d 203, 208–09 (1st Cir.1985).

murder is measurably less than clear and convincing.

There is, however, clear and convincing evidence that Jimmy Limoli stole drugs belonging to Spagnolo and was forced by Spagnolo to confess to this. The evidence also indicates that Spagnolo complained to alleged LCN Capo Vincent Ferrara concerning this. Less than two months later Limoli was killed. Ferrara is now being prosecuted for Limoli's death. Spagnolo, however, has not been charged.

Finally, however, there is sufficient evidence in the April 3, 1990 Hannigan Affidavit to establish that Spagnolo has engaged in the use of force and violence to collect debts, among other things, in the course of his career as a LCN member or associate.

## V. ANALYSIS REGARDING DIGIACOMO

### A. *Flight*

■ The government has not proven by a preponderance of the evidence that the conditions described below will not reasonably assure DiGiacomo's appearance in this case. The court recognizes that there is evidence which tends to suggest DiGiacomo presents a risk of flight. The drug charges weigh in favor of this inference. More importantly, it appears that DiGiacomo is a LCN Capo. As such, he is an official of a national and international organization with the resources to finance and facilitate his possible flight. Some similarly situated LCN figures have failed to appear to face the charges against them.

DiGiacomo himself seems to have national and international organized crime contacts, although it does not appear he could hide safely in Sicily. He evidently participated in hiding Joseph Russo in Montreal and has in several ways indicated that he views flight as appropriate for LCN figures charged with murder.

The foregoing evidence relating to flight, however, is outweighed by the countervailing facts which indicate that the conditions described below will reasonably assure DiGiacomo will not flee. DiGiacomo has strong ties to his family. Although they might, with particular difficulty, attempt to flee together, the court is not persuaded DiGiacomo is likely to abandon them.

More importantly, DiGiacomo knew for more than three years before his indictment that the government had substantial evidence against him, including likely tape recordings relating to his membership in the Mafia and involvement with narcotics. Apparently DiGiacomo decided to face the type of charges he now confronts and to accept the reasonably foreseeable consequences of a possible conviction on such charges. The court does not believe that the tape recording of the induction ceremony or the actual indictment in this case are facts which are likely to alter DiGiacomo's calculation concerning flight. If he did not flee previously, it is not likely that he would flee now, forfeiting all of his property and leaving behind his indicted alleged superiors in the Patriarca family.

In any event, DiGiacomo will be required to remain at home, subject to electronic monitoring, except for a reasonable number of authorized and monitored visits to his attorney's office. These conditions should both deter DiGiacomo from fleeing and facilitate his capture if he attempts to flee.

In view of the foregoing, the court concludes that the government has failed to bear its burden of proving that no combination of conditions will reasonably assure DiGiacomo's appearance at future court proceedings.

### B. *Danger*

■ The evidence described earlier concerning the Mafia, DiGiacomo's role in the Patriarca family, and his past conduct do indicate that he would present a danger to the community, and perhaps to particular individuals, if released unconditionally. The government has, however, failed to prove that the conditions described below will not reasonably assure the safety of the community or any individual.

With regard to the community, the court is mindful that Congress has found that alleged drug offenders generally pose special risks if released. The evidence in this

case, however, indicates that DiGiacomo was ambivalent, and perhaps hypocritical, with regard to being involved with narcotics. In any event, it appears that while DiGiacomo aided and abetted the narcotics activities of others, he did not personally deal drugs. Thus, the court expects he will not be dangerous in the sense of engaging in drug activity if released on appropriate conditions.

The evidence indicates that DiGiacomo's primary, dangerous illegal activity was loansharking—lending money at high rates of interest, while relying upon violence or a reputation for violence to collect such loans. It does not appear, however, that he personally resorted to violence to collect debts or had to direct others to use violence to collect debts on his behalf. Nor did he previously have unlimited resources to engage in loansharking. Rather, delaMontaigne was required to provide some of the funds to be lent by DiGiacomo for Rosato's drug dealing. Thus, the court does not find that DiGiacomo is likely to endanger the community through loansharking activities if released on appropriate conditions.

DiGiacomo also engaged in gambling activities, such as illegal football cards and poker games. These activities, however, are neither likely to continue, nor endanger the community if continued, upon DiGiacomo's release.

The only specific individuals identified who might be endangered if DiGiacomo is released are delaMontaigne and his family. However, DiGiacomo apparently understands the severe consequences almost certain to result if he directly or indirectly threatens or injures a government agent or his family. Neither he nor his associates did so in the three years prior to his indictment. It would be particularly risky for them to do so now. Thus, the court does not believe that DiGiacomo's release on appropriate conditions will endanger delaMontaigne or his family, although the court recognizes the risk which is, in any event, inherent in delaMontaigne's now public role as a former undercover operative.

The court has also considered the risk presented by DiGiacomo's release to other individuals, particularly other potential witnesses, and to the administration of justice. DelaMontaigne observed DiGiacomo advise a witness to lie to investigators when he was not a subject of investigation himself. This is a serious matter. There is, however, no evidence that DiGiacomo directly or indirectly attempted to intimidate any witness. The restriction on his personal contacts when released should inhibit DiGiacomo's ability to suborn perjury personally in this case. The serious sentence he is likely to receive if it is shown that he has, directly or indirectly, sought to intimidate any witness or obstruct justice should also deter such conduct. Similarly, the fact that the tape recordings and testimony of delaMontaigne will, in any event, constitute formidable evidence of many pending charges, should discourage DiGiacomo from seeking to tamper with any other witness.

The court views the evidence concerning the Mafia and DiGiacomo's position as a Capo in the Patriarca family to be the most weighty evidence favoring his detention. The LCN has been shown to engage in violence, intimidation of witnesses, and obstruction of justice—although certainly not in connection with every prosecution. The court views DiGiacomo as a person in a position within the Mafia to both receive and issue orders. Other LCN figures have directed criminal activity from prison or while under house arrest, although not under conditions as stringent as those which will be imposed on DiGiacomo. It would, however, be at least marginally easier for DiGiacomo to direct criminal activity if released than if incarcerated. These factors militate in favor of continued detention.

When all of the evidence is viewed in context, however, the court concludes that the government has not shown that the conditions described below will not reasonably assure the safety of the community or any individual.

## VI. ANALYSIS REGARDING SPAGNOLO

### A. *Flight*

█ The analysis relating to Spagnolo parallels that concerning DiGiacomo, as to

whom the evidence concerning flight and dangerousness is stronger. The court will not repeat all of the analysis concerning DiGiacomo which also applies to Spagnolo. Some of the key points, however, are as follows.

As a member of the Mafia, Spagnolo too is part of an international organization with the resources to try to help him escape. He does not, however, have DiGiacomo's national and international contacts. Nor does he have any meaningful financial resources.

Spagnolo is a life long resident of this area. Although in contrast to DiGiacomo, Spagnolo does not now have an immediate family, he is close to his brothers, sisters, and many nieces and nephews in the Boston area. If he did not flee in the three years prior to his indictment, the court does not expect he will flee after his brother pledges his home and the home which belonged to his mother in order to assure his appearance at future court proceedings.

Thus, the government has failed to prove that the posting of this security and the electronic monitoring to which Spagnolo will be subject are not adequate to reasonably assure that he will not flee.

### B. *Danger*

██ With regard to danger, Spagnolo apparently had very limited success in his sporadic efforts to deal drugs before he was indicted. The conditions of release described below should assure that he will not engage in narcotics crimes pending trial.

The evidence does suggest that Spagnolo has personally used violence or threats of violence in connection with collecting debts, recovering stolen drugs, and committing minor robberies. The evidence does not establish that Spagnolo has ever participated in a murder. The home confinement which will be a condition of Spagnolo's release should protect the community against the danger he has traditionally presented.

For the reasons stated earlier concerning DiGiacomo, the court does not believe that releasing Spagnolo on the conditions de-

scribed below will present a danger to dela-Montaigne or his family. Nor is there evidence to suggest that Spagnolo presents a particular risk to any other witness. Unlike DiGiacomo, Spagnolo is not charged with attempting to suborn perjury or to obstruct justice, and there is no evidence that he has done so.

Once again, the most formidable evidence regarding Spagnolo's dangerousness is his membership in the Mafia. As a Soldier in the Mafia, he may have the capacity to obtain criminal assistance from "associates" who are not "made members" of the organization. He does not have the authority to direct other members of the LCN. The court views Spagnolo as now constituting less of a threat to safety than DiGiacomo. As the court has determined that conditions described below are adequate to reasonably assure the safety of the community with regard to DiGiacomo, they are also sufficient with regard to Spagnolo.

### VII. THE CONDITIONS

██ As indicated earlier, the court recognizes that DiGiacomo and Spagnolo each present some risk of flight and to the safety of the community. The court finds, however, that there is a combination of conditions that will reasonably assure that those risks will not be realized.

Central to these conditions is the requirement that each defendant remain at his residence every day, 24 hours a day. This requirement will be subject to electronic monitoring, which will promptly alert the Pretrial Services Department of this Court if either defendant leaves his home without authorization. Each defendant will be authorized by Pretrial Services to leave home only for consultation with their attorneys and for medical appointments.

In addition, each defendant will be allowed to meet or communicate—directly or indirectly—only with their attorneys, certain members of their families, and a small number of close friends not known by the government to be associated with the Mafia. This requirement will be monitored, in part, by the installation of a pen-register to

record the destination of outgoing calls, which may be supplemented by the tracing of incoming calls. Each defendant will also be required to keep a record of his communications. The information concerning defendants' communications will be available to the government.

As a corollary of this limitation on contacts, each defendant will be prohibited from communicating with his co-defendants, except in the presence of counsel and for the purpose of preparation of the defense of this case.

In addition, DiGiacomo will be required to post with the court all of his assets, which will be subject to forfeiture if he fails to appear as required. Vincent Spagnolo shall post his home and arrange for the posting of the home formerly owned by his mother. They too will be subject to forfeiture if the defendant Anthony Spagnolo fails to appear as required.

The court concludes that these conditions will reasonably assure the appearance of each defendant, as well as the safety of relevant individuals and of the community.

## VIII. THE STAY

The release of DiGiacomo and Spagnolo will be permitted when the necessary conditions are met, but, in any event, not before 1:00 p.m. on July 16, 1990. The stay of their release until at least July 16, 1990, is intended to permit the government to decide whether it wishes to appeal and, if so, to seek a longer stay from the Court of Appeals.

## IX. ORDER REGARDING DIGIACOMO

In view of the foregoing, the court has determined with regard to the defendant Biagio DiGiacomo that there is a combination of conditions which will reasonably assure his appearance as required and the safety of any other person and the community. Accordingly, he shall be released pending trial at 1:00 p.m. on July 16, 1990, or as soon thereafter as he has satisfied the prerequisites for his release described below, on the following conditions:

1. The defendant shall not commit any violation of federal, state, or local law while on release in this case.

2. The defendant shall appear at all proceedings as required and shall surrender as directed to serve any sentence imposed.

3. The defendant shall reside at 36 Whitby Street, Boston, Massachusetts. He is restricted to his residence, subject to electronic monitoring; defendant shall enter into the Electronic Monitoring Conditions agreement attached hereto as Exhibit A. Defendant shall not leave his residence without the prior approval of the Pretrial Services Department of this Court. In accordance with procedures to be established by Pretrial Services, authorization will be given for a reasonable number of visits to the offices of defendant's counsel and to attend medical appointments. Procedures for reporting concerning the commencement and termination of such visits and appointments shall be established by Pretrial Services.

4. DiGiacomo shall meet and/or communicate—directly or indirectly through others—only with his attorney(s) and individuals specifically designated by the court. Defendant has requested the court designate the 35 individuals listed on Exhibit C hereto. The government has expressed a persuasive objection to the designation of Leonard Arone and Joseph Arone; contact with them is not authorized. In addition, the government requests identifying information concerning the remaining individuals on the list. Thus, defendant shall within 2 weekdays of this Order file the addresses of the individuals listed on Exhibit C, identify their relationship to the defendant and, where possible, provide their birthdates. The government shall within 3 weekdays following the submission of this information file any additional objections. If the government objects to any individual, defendant will not be authorized to have contact with that person without further order of this court. Anyone on Exhibit C as to whom the government does not object is hereby authorized to meet and communicate with DiGiacomo pursuant to this Order.

In addition, defendant may communicate with his co-defendants in this case, provided that such communication occurs in the presence of counsel and is limited to the preparation of the defense of this case.

Pretrial Services shall require defendant to keep a record of his direct and indirect communications in order to monitor this provision.

5. Defendant shall have only one telephone line at his residence, which will be subject to monitoring by a pen register to record the destination of outgoing calls and, if the court determines it is feasible, a tracing device to identify the origin of incoming calls.

6. Defendant shall execute an agreement to forfeit upon failing to appear as required, and furnish in appropriate form the related documents, concerning the following real estate: (a) 36 Whitby Street, Boston, MA; (b) 19 Bennington Street, Boston, MA; (c) 7 Laurel Avenue, Waltham, MA; and (d) 78–80 Fuller Street, Waltham MA.

7. Defendant shall also:

a. refrain from possessing a firearm, destructive device, or other dangerous weapon.

b. refrain from the excessive use of alcohol or the use of any narcotic drug unless prescribed by a physician.

c. Surrender any passport.

d. Obtain no passport.

e. Abide by any other condition consistent with the purposes of this Order which Pretrial Services deems appropriate.

8. The defendant is hereby advised of the penalties and sanctions relating to the violation of any of the foregoing conditions which are described on Exhibit B hereto. Defendant's attention is particularly directed to the requirement that he not personally, or with or through others, seek to intimidate a witness or otherwise obstruct justice.

9. Defendant shall sign a document acknowledging that he is aware of the conditions of his release; promising to obey those conditions, to appear as directed, and to surrender to serve any sentence imposed; and confirming his awareness of the penalties and sanctions described on Exhibit B hereto.

## X. ORDER REGARDING SPAGNOLO

In view of the foregoing, the court has determined with regard to the defendant Anthony Spagnolo that there is a combination of conditions which will reasonably assure his appearance as required and the safety of any other person and the community. Accordingly, he shall be released pending trial at 1:00 p.m. on July 16, 1990, or as soon thereafter as he has satisfied the prerequisites for his release described below, on the following conditions:

1. The defendant shall not commit any violation of federal, state, or local law while on release in this case.

2. The defendant shall appear at all proceedings as required and shall surrender as directed to serve any sentence imposed.

3. The defendant shall reside at 10 Brookdale Street, Revere, Massachusetts. He is restricted to his residence, subject to electronic monitoring; defendant shall enter into the Electronic Monitoring Conditions agreement attached hereto as Exhibit A. Defendant shall not leave his residence without the prior approval of Pretrial Services Department. In accordance with procedures to be established by Pretrial Services, authorization will be given for a reasonable number of visits to the offices of defendant's counsel and to attend medical appointments. Procedures for reporting concerning the commencement and termination of such visits and appointments shall be established by Pretrial Services.

4. Spagnolo shall meet and/or communicate—directly or indirectly through others—only with those individuals listed on Exhibit D hereto, and his attorney(s). In addition, defendant may communicate with his co-defendants in this case, provided that such communication occurs in the presence of counsel and is limited to the preparation of the defense of this case.

Pretrial Services shall require defendant to keep a record of his direct and indirect communications to monitor this provision.

5. Spagnolo shall have only one telephone line at his residence, which will be subject to monitoring by a pen register to record the destination of outgoing calls and, if the court decides it is feasible, a tracing device to identify the origin of incoming calls.

6. Defendant's brother Vincent Spagnolo shall execute an agreement to forfeit upon Anthony Spagnolo's failing to appear as required (a) his residence at 19 Juniper Drive, Saugus, Massachusetts and (b) his mother's former home at 10 Brookdale Street, Revere, Massachusetts. He shall also execute any necessary documents relating to this agreement to forfeit.

7. Defendant shall also:

a. refrain from possessing a firearm, destructive device, or other dangerous weapon.

b. refrain from the excessive use of alcohol or the use of any narcotic drug unless prescribed by a physician.

c. Surrender any passport.

d. Obtain no passport.

e. Abide by any other condition consistent with the purposes of this Order which Pretrial Services deems appropriate.

8. The defendant is hereby advised of the penalties and sanctions relating to the violation of any of the foregoing conditions which are described on Exhibit B hereto. Defendant's attention is particularly directed to the requirement that he not personally or with or through others, seek to intimidate a witness or otherwise obstruct justice.

9. Defendant shall sign a form acknowledging that he is aware of the conditions of his release; promising to obey those conditions to appear as directed, and to surrender to serve any sentence imposed; and confirming his awareness of the penalties and sanctions described on Exhibit B hereto.

## EXHIBIT A

United States District Court
District of Massachusetts
U.S. Pretrial Services Office
Electronic Monitoring Conditions

I, _____, Case No. _____, understand that I have been placed in the electronic monitoring program as a condition of my pretrial release. I further acknowledge that I will comply with the rules of this program as well as any additional conditions set by the Court as requirements for my pretrial release.

I shall reside at _____, telephone number _____, until I receive permission of the Court to change my residence.

I acknowledge the following conditions:

1. I must have a telephone at my residence and provide the Pretrial Services Office with a copy of my phone bill each month. I understand that I may not have special phone services/equipment (i.e. call waiting, call forwarding, answering machine, cordless phone, etc.)

2. I will provide my Pretrial Services Officer with an itinerary of my schedule and not deviate from it without approval. I understand that I am required to remain at the above address at all times unless granted prior approval by the Pretrial Services Officer in the following circumstances:

_____
_____
_____
_____
_____

3. In the event of an emergency, I will attempt to notify Pretrial Services at _____ prior to leaving the above address. I will contact Pretrial Services immediately about this emergency upon the earliest opportunity. I will be expected to provide documented proof of the emergency.

4. I will provide Pretrial Services with copies of paycheck stubs, medical and dental appointment verifications and such other documentation as may be required.

5. I understand that to insure compliance with the program I will be monitored by a tamper-proof, non-removable, ankle bracelet which I agree to wear 24 hours a day during the entire period of my participation. I understand that this monitoring will be accomplished by a receiver attached to my residence telephone connected electronically by common carrier to a computer at Guardian Technologies, Inc. I may also receive random telephone calls and personal visits by a Pretrial Services Officer to which I agree to respond as directed.

6. I agree to notify Pretrial Services immediately of telephone or equipment failure.

7. I acknowlege that the loss of a receiving signal, the receipt of a tamper signal, or the receipt of a signal indicating absence from the residence, is evidence of a violation. Physical evidence indicating the monitoring device has been tampered with is a violation. I agree that a violation determined by the monitoring equipment will be considered evidence of a bail violation and a computer printout will be used as evidence in a violation hearing.

8. I agree to hang up the telephone immediately when I hear a clicking sound caused by the receiver/dialer. I will inform my caller that I will call back in five minutes. My family and I agree to limit calls to five minutes and leave the telephone open for five minutes between each call. In no case will the telephone be taken off the hook.

9. I realize that it will be necessary for the monitoring device to be attached to my residence telephone and that it will be necessary during the period of this program for Pretrial Services Officers to maintain or inspect this equipment as they determine necessary.

10. I understand that I will be held responsible for any damage, other than normal wear, to the equipment installed in my residence. If I do not return the equipment, or do not return it in good condition, I will be charged for its replacement or repair. I further understand that the United States and Guardian Technologies, Inc. are not liable for any damage incurred as a result of my wearing or tampering with the monitoring device.

11. The charges incurred for telephone calls from my residence phone and the expenses incurred for electricity used to monitor my participation shall be paid by me.

12. I understand that I cannot go beyond 150 feet from the receiver (telephone) or a violation will be detected.

13. Additional conditions/instructions:_____

_____

_____

_____

_____

_____

_____

I have read or had read to me the above and have been given an opportunity to request clarification from the Pretrial Services Officer. I understand the procedures I am to follow. I understand that if I should violate any of these terms it shall be deemed a violation of my pretrial release and I shall be subject to arrest

and return to court as a violator subject to additional penalties. I fully understand these rules and I will abide by them.

_____ _____
Defendant/Date Pretrial Services Officer/Date

_____

## EXHIBIT B

### Advice of Penalties and Sanctions

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 U.S.C. § 3148, and a prosecution for contempt as provided in 18 U.S.C. § 401 which could result in a possible term of imprisonment and/or a fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not less than two years nor more than ten years, if the offense is a felony; or a term of imprisonment of not less than ninety days nor more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself.

18 U.S.C. § 1503 makes it a criminal offense punishable by up to five years in jail and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 U.S.C. § 1510 makes it a criminal offense punishable by up to five years in jail and a $250,000 fine to obstruct a criminal investigation; 18 U.S.C. § 1512 makes it a criminal offense punishable by up to ten years in prison and a $250,000 fine to tamper with a witness, victim or informant; and 18 U.S.C. § 1513 makes it a criminal offense punishable by up to ten years in jail and a $250,000 fine to retaliate against a witness, victim or informant, or threaten or attempt to do so.

It is a criminal offense under 18 U.S.C. § 3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction, for:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor, the defendant shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted.

### Acknowledgement of Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Signature of Defendant

_____
Address

_____
City and State Telephone

Directions to United States Marshal

( ) The defendant is ORDERED released after processing.

( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and/or complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date:_____ _____
Judicial Officer

---

## EXHIBIT C

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
*************************************
UNITED STATES OF AMERICA *
 * CRIMINAL # 90–65–WF
 V. * BBO # 151800
 *
BIAGIO DIGIACOMO *
*************************************
```

### LIST OF PERSONS TO VISIT BIAGIO DIGIACOMO

The list herein contains names of primary family members, and some neighbors and friends to be allowed to visit Biagio DiGiacomo, in the event that he is released to his home.

| | |
|---|---|
| Assunta Cacciatore | Jerry Cacciatore |
| Andrea Cacciatore | Eugenia Cacciatore |
| Crocetta Cacciatore | Deborah Pagliucci |
| Michael Pagliucci | Denise Baglio |
| Jack Baglio | Linda Petrillo |
| Michael Petrillo | Michael Petrillo, Jr. |
| Dominic Petrillo | Carmella Rubino |
| Vincent Rubino | Gelsomina Rubino |
| Anthony Rubino | Nancy Fratorolli |
| Donato Fratorolli | Angelo Castellano |
| Angela Castellano | Florence Leone |
| Carmen Castellano | Raymond Busiemi |
| Mary Busiemi | Josephine Busiemi |
| Betty Busiemi | Nancy Chaiara |
| Amadeo Chaiara | Corey Chaiara |
| Betty Chiara, Jr. | Benedetta Caramazza |
| Giuseppina DiGiacomo | Salvatore DiGiacomo |
| Filippo Leonforte | |

Of course, counsel and those associated with the preparation of the defence of Mr. DiGiacomo should be allowed to visit him.

Respectfully submitted, by his attorney,

/s/ Richard M. Egbert

Richard M. Egbert
125 Summer Street
17th Floor
Boston, Massachusetts 02110
439–6020

## CERTIFICATE OF SERVICE

I, Patricia A. Salem, do hereby certify that I served a copy of the herein LIST OF PERSONS TO VISIT BIAGIO DIGIACOMO, to Brad Bailey, Assistant United States Attorney, by hand delivering same, this 28th day of June, 1990.

/s/ Patricia A. Salem

Patricia A. Salem

---

## EXHIBIT D

## PERSONS AUTHORIZED TO MEET AND/OR COMMUNICATE WITH ANTHONY SPAGNOLO

1. Vincent Spagnolo (Brother)
 19 Juniper Drive
 Saugus, MA 01906

2. Donna Spagnolo (Sister–In–Law)
 19 Juniper Drive
 Saugus, MA 01906

3. Christina Spagnolo (Niece)
 19 Juniper Drive
 Saugus, MA 01906

4. Steven Spagnolo (Nephew)
 19 Juniper Drive
 Saugus, MA 01906

5. Rosario Spagnolo (Brother)
 311 Lincoln Street
 Revere, MA 02151

6. Dorothy Spagnolo (Sister–In–Law)
 311 Lincoln Street
 Revere, MA 02151

7. Joseph Spagnolo (Nephew)
 311 Lincoln Street
 Revere, MA 02151

8. Brian Spagnolo (Nephew)
 311 Lincoln Street
 Revere, MA 02151

9. Constance Riley (Sister)
 18 Dustin Street
 Saugus, MA 01906

10. Kimberly Riley (Niece)
 18 Dustin Street
 Saugus, MA 01906

11. Theresa Riley (Niece)
 18 Dustin Street
 Saugus, MA 01906

12. Matthew Riley (Nephew)
 18 Dustin Street
 Saugus, MA 01906

13. Lisa Arone (Sister)
 1214 Sheffield Way
 Saugus, MA 01906

14. Ann Marie Arone (Niece)
 1214 Sheffield Way
 Saugus, MA 01906

15. Hayley Arone (Niece)
 20 Andrew Street
 Malden, MA

16. Catherine Tiro (Sister)
 321 Lynn Street
 Malden, MA

17. Maria Tiro (Niece)
 321 Lynn Street
 Malden, MA

18. Ralph Tiro (Nephew)
 321 Lynn Street
 Malden, MA

19. Lisa Mercurio (Niece)
 210 Prospect Avenue
 Revere, MA 02151

20. Robert Mecurio (Nephew)
 210 Prospect Avenue
 Revere, MA 02151

(These Mercurio's are totally unrelated to the Mercurio's the Government has referred to as being a fugitive. The similarity of names is a mere coincidence).

21. Mary Flammia (Sister)
 740 Washington Ave.
 Revere, MA 02151

22. Charles Flammia (Brother–In–Law)
 740 Washington Ave.
 Revere, MA 02151

23. Anthony Flammia (Nephew)
 740 Washington Ave.
 Revere, MA 02151

24. Alfred Flammia (Nephew)
 740 Washington Ave.
 Revere, MA 02151

25. Joseph Flammia (Nephew)
 740 Washington Ave.
 Revere, MA 02151

26. Edward Flammia (Nephew)
 740 Washington Ave.
 Revere, MA 02151

27. Charles Flammia (Nephew)
 736 Washington Avenue
 Revere, MA 02151

28. Linda Laviska (Niece)
 15 Baker Street
 Saugus, MA 01906

29. Richard Laviska (Nephew)
 15 Baker Street
 Saugus, MA 01906

30. Richard Laviska (Nephew)
 15 Baker Street
 Saugus, MA 01906

31. Carol Swezzy (Niece)
 10 Orient Place
 Melrose, MA

32. Robert Swezzy (Nephew)
 10 Orient Place
 Melrose, MA

33. Linda Lattanzi (Niece)
 160 Winthrop Ave.
 Revere, MA 02151

34. Peter Lattanzi (Nephew)
 160 Winthrop Ave.
 Revere, MA 02151

35. Annette D'Augusta (Niece)
 54 Case Drive
 Revere, MA 02151

36. Peter D'Augusta (Nephew)
 54 Case Drive
 Revere, MA 02151

37. Jannette Vuolo (Nephew)
 48 Asti Ave.
 Revere, MA 02151

38. Lawrence Vuolo (Nephew)
 48 Asti Ave.
 Revere, MA 02151

39. Christine Wilder (Nephew)
 38 Ashland Street
 Melrose, MA

40. Raymond Wilder (Nephew)
 38 Ashland Street
 Melrose, MA

41. Clara Mazzi (Mother–In–Law)
74 Woodville Street
Everett, MA

42. Tania Gaff (Sister–In–Law)
8 Hathorne Street
Salem, MA

43. Patricia Spagnolo (Wife)
13 Prescott Street
Everett, MA

44. Michael Spagnolo (Son)
13 Prescott Street
Everett, MA

45. Louis Gioia (Neighbor and friend to Spagnolo's for 50 years).
772 Washington Ave.
Revere, MA 02151

46. Anna Rescigno (Neighbor and friends for many, many years).
772 Washington Ave.
Revere, MA 02151

47. John Rescigno (Neighbor and friends for many, many years).
772 Washington Ave.
Revere, MA 02151

---

## SUPPLEMENTAL ORDER

By Order dated July 5, 1990, defendants Biagio DiGiacomo and Anthony Spagnolo were released pending trial on certain conditions. These conditions include, but are not limited to, the requirement that they be restricted to their respective residences except when authorized by the Pretrial Services Department of this Court to attend meetings with counsel and medical appointments. Compliance with this condition will be monitored, in part, by an electronic, tamper-proof, non-removable ankle bracelet which will immediately signal if the defendant has moved more than 150 feet from the telephone at his residence without authority.

In the event that it appears to Pretrial Services that DiGiacomo or Spagnolo have left their residence without permission, it will be important that they be pursued promptly. The Court is informed that the Department of Justice has assigned this duty to the Federal Bureau of Investigation. Accordingly, it is hereby ORDERED that:

1. If Pretrial Services has reason to believe that either DiGiacomo or Spagnolo is absent from his residence without its authorization, Pretrial Services shall promptly inform the Federal Bureau of Investigation; and

2. Upon receipt of such notice from Pretrial Services, the Federal Bureau of Investigation is hereby authorized and ordered, pursuant to 28 U.S.C. § 1651, to take all measures appropriate to a fugitive investigation, including but not limited to arresting and detaining DiGiacomo or Spagnolo for the purpose of bringing him before a Magistrate or Court of competent jurisdiction in accordance with the provisions of Fed.R.Crim.P. 5.