**UNITED STATES of America, Plaintiff,**

v.

**Raymond PATRIARCA, Jr., Defendant.**

**Crim. A. No. 89–289.**

United States District Court,
D. Massachusetts.

June 21, 1991.

Order July 1, 1991.

As Corrected July 15, 1991.

Jeff Auerhahn, James Herbert and Gregg Sullivan, Asst. U.S. Attys., New England Organized Crime Strike Force, Dept. of Justice, Boston, Mass., for plaintiff.

Oteri, Weinberg & Lawson, Martin G. Weinberg, Boston, Mass., John F. Cicilline, Providence, R.I., for defendant Raymond Patriarca.

Balliro, Mondano & Balliro, Joseph J. Balliro, Boston, Mass., Henry D. Katz, Chelsea, Mass., for defendant Robert Carrozza.

Elliot M. Weinstein, Boston, Mass., for defendant Dennis Lepore.

Joseph Russo, pro se.

WOLF, District Judge.*

Basically, in summary, the Defendant Raymond J. Patriarca, also known as Junior, is charged with a violation of the Racketeer–Influenced Corrupt Organization ("RICO") statute.[1] The predicates are premised on violations of the Travel Act,[2] two of which relate directly to alleged extortions.

He was arrested on March 22, 1990. He has been detained ever since, pursuant to a May 1, 1990, order by the magistrate, finding that no combination of conditions of release would reasonably assure the safety of the community. The Defendant has been incarcerated in the federal prison in Danbury, Connecticut, which is more than four hours from here.

He suffers from recurring cancer, which requires regular medical attention. He now seeks his release prior to a possible one-year trial, which is scheduled to begin in September 1991, in order to make financial, educational and personal arrangements for his family. He also believes that

---

* Editor's Note: This opinion was originally issued orally from the Bench (see p. 596, infra). The Court has added footnotes and the opinion has been edited for publication by omission of ceremonial opening and closing remarks.

1. 18 U.S.C. § 1961 *et seq.*

2. 18 U.S.C. § 1952.

his release will assist him in working more effectively with his counsel.

The Government has opposed the request that Mr. Patriarca now be released and seeks his continued detention based on both dangerousness and risk of flight.

■ I find, however, that the Government has not proved by a preponderance of the evidence that no combination of conditions will reasonably assure the Defendant's appearance in the future. Nor has the Government proven by clear and convincing evidence that no combination of conditions will reasonably assure the safety of any person or the community if Mr. Patriarca is released.

Rather, the Court finds that there is a combination of realistic, feasible conditions which will provide the required reasonable assurances. These include the conditions that the Defendant remain in his home at Lincoln, Rhode Island, 24 hours a day; that he leave only with the prior approval of Pretrial Services for scheduled medical care in the personal custody of one of his two attorneys, either Mr. Cicilline or Mr. Weinberg, and for any medical emergencies; and that all consultations with his attorneys will occur at his home in Lincoln, Rhode Island.

His direct and indirect communications with others, that is, his personal communications and any messages he may send or receive through others, will be restricted to a small number of people approved by the Court after consultation with the Government. These people will not include any known members of the La Cosa Nostra ("LCN"), or anybody else to whom the Government has a compelling objection.

The Defendant's compliance with the requirement that he stay at home will be monitored by an electronic bracelet. This will detect any flight within five minutes and cause the Pretrial Services office of this Court to be so informed within ten minutes. I expect this, among many other things that I'll describe, will deter the Defendant from attempting to flee.

In addition, I am requiring that many members of the Defendant's family post as security, in connection with these conditions, property, including their personal residences, worth over four million dollars. By agreement of the Defendant, that property will be forfeitable not only if the Defendant flees, but if he should violate any other condition of his release, including the requirement that he not engage in any criminal activity while released and the requirement that he not engage in any communications with individuals other than those whom I will authorize.[3]

In addition, once again pursuant to the Defendant's agreement, he will be subject to random visits by the FBI and other law enforcement personnel to determine whether he is complying with the conditions of release.

These conditions of release and related conditions, which will be developed in the coming week, are similar to, but more stringent than, the conditions which I imposed when I released Messrs. DiGiacomo, Spagnolo and Gioachini, participants in the now-notorious Mafia induction ceremony on October 29, 1989.[4]

The Pretrial Services department of this Court encountered no problems with supervising those three individuals while they were on release. The testimony I received on May 10, 1991, indicated that they were among the least difficult, from the perspective of Pretrial Services, of pretrial detainees.[5] Each of them was released and no problems regarding their release were brought to my attention. They each pled guilty to guideline sentences. They each voluntarily surrendered to serve those sentences, and are now serving them.[6]

---

**3.** *See United States v. Vaccaro,* 719 F.Supp. 1510, 1517 (D.Nev.1989), *appeal dismissed,* 931 F.2d 605 (9th Cir.1991).

**4.** *United States v. DiGiacomo,* 746 F.Supp. 1176 (D.Mass.1990); *United States v. Gioacchini,* Cr. No. 90–10065–WF, Memorandum and Order dated August 7, 1990.

**5.** May 10, 1991 Transcript, Testimony of Pretrial Services Officer Alan Chipman at page 133 ("May 10, 1991 Tr. at ___").

**6.** *Id.*

I also note that the conditions are much more stringent than those imposed on the eight defendants released in the companion case of *United States v. Bianco*,[7] now being prosecuted in Connecticut. Once again, none of the eight defendants released in that case has fled, nor has any request been made to revoke their release.[8]

So as I said, in a moment I will describe in detail the reasons for this decision. I will, as I will explain at the end, require counsel along with Pretrial Services to take my prior order in the *DiGiacomo* case and seek to reach agreement on a joint proposed order to apply in this case to be developed by the close of business next Wednesday.

It's also my intention to stay the Defendant's release for at least two weeks, so the Government will have an opportunity to consider the Opinion and the Order and decide whether it wishes to appeal and seek a further stay from the Court of Appeals.

In addition, it is my intention to review the Defendant's release about 60 days after he is released, or earlier if either party requests. That will give me an opportunity to monitor whether the Defendant has complied with the terms of his release during that period. It will also give the Defendant an opportunity to make whatever arrangements he wishes for his family and consider whether he wishes to continue to be released. That is not an entirely academic issue.

In another case in which the Government vigorously asserted that somebody, Vincent Marino, ought to be detained for violating conditions of release, I found in about December 1989 that there continued to be some combination of conditions on which Mr. Marino might be released, but I suggested that perhaps he did not want to be released indefinitely. Mr. Marino, after staying out for about two weeks, including the Christmas holidays and New Year's, decided to report back to the custody of the United States. He subsequently pled guilty and has since been incarcerated.

That, in summary, is where this opinion will come out. The Court of Appeals in Mr. Tortora's case noted quite properly that it did not receive a detailed explanation from the district judge for his conclusions.[9] It is my intention to make my thinking as clear and complete as possible both for the benefit of those who are directly interested and for the record with regard to any possible review.

I would do this in the form of a written opinion, but given the fact that I've decided to release the Defendant and the amount of time that it would take me to satisfy myself to write this, it seems to me most appropriate to do this orally. But as I said, the fact that I'm doing this orally should not suggest that the decision is being reached casually.

As I said, the magistrate detained Mr. Patriarca on the basis of danger to the community and did not address the issue of flight. I, however, must consider this matter de novo, and it's particularly appropriate that I do so.[10] I have considerably more information concerning the Defendant and this case than could have been available to the magistrate more than a year ago, and I have experience with other defendants in similar cases that was not available to anybody at the time the magistrate reached his decision.

I held hearings on this motion to revoke Mr. Patriarca's detention on May 9, 10, 13 and 15, 1991. Those hearings included testimony on May 10, 1991, of Nancy Long from Guardian Technology, the organization which provides the electronic monitoring services at issue here, and from Alan Chipman, a representative of our Pretrial Services office.

In the course of these proceedings, I've had an opportunity to observe Mr. Patriarca in court, to consider the statement he made, and to make my assessment of his

---

7. *United States v. Bianco, et al.,* Cr. No. H–90–18 (AHN); Defendant's Exhibit N.

8. May 10, 1991 Tr. at 134.

9. *United States v. Tortora,* 922 F.2d 880, 883 (1st Cir.1990).

10. *Id.* at 883 n. 4.

credibility. These events affect my predictions regarding his behavior.

■ With regard to risk of flight, it is the obligation of the Government, to obtain detention, to prove by a preponderance of the evidence that no combination of conditions will reasonably assure the Defendant's appearance in the future.[11]

With regard to the other possible basis for detention, danger to any person or the community, clear and convincing evidence is needed to establish the facts relied upon to support a finding that no combination of conditions will reasonably assure the safety of any person or the community.[12] In addition, the Government must prove clearly and convincingly that no set of release conditions will reasonably assure the safety of any person or the community.[13]

■ Danger in this context, as the Government correctly has contended, means more than a risk of physical violence. This also refers to the danger that the Defendant might engage in criminal activity to the detriment of the community.[14]

■ I note that in many alleged Mafia cases, including the *DiGiacomo* case, the defendant comes before the court saddled with the rebuttable presumption that no combination of conditions will reasonably assure his appearance or the safety of the community by virtue of the nature of the charges against him.[15] That rebuttable presumption is established by statute when certain types of offenses are charged.[16] The charges against Mr. Patriarca in this case do not create any such rebuttable presumption.

As the Court of Appeals has reminded us, detention determinations must be made individually and be based on the evidence regarding a particular defendant.[17] In connection with this, as I said in my *DiGiacomo* decision [18] and as has been recognized elsewhere,[19] it is appropriate to consider the Defendant's membership in the Mafia, the evidence of such membership.

This is a factor which militates in favor of the detention. The Mafia or LCN is a far-flung organization with a capacity to facilitate flight. Membership at any level inherently entails a risk of dangerousness. An individual's role in that organization is relevant, because those with the ability to direct the criminal activity of others pose a special threat to the community.[20]

But membership in the Mafia, or evidence of membership in the Mafia, cannot properly be the end of the inquiry. Courts are called upon to make individual decisions and predictions, and that's what I have done in this and other cases.

As I've noted earlier, I did release on certain conditions Messrs. DiGiacomo, Spagnolo and Gioachini, other attendees at the Mafia induction ceremony on October 29, 1989, in decisions I rendered last year.

More recently, however, I denied Mr. Patriarca's co-defendant Dennis Lepore's request for release, in part because I found that he had fled in connection with the original indictment in this case, and I was not satisfied that there was a combination of reasonable conditions that would reasonably assure his appearance in the future. Each defendant is unique and each is entitled to have his case decided with a recognition of that.

■ It's also essential, I understand, to recognize that the conditions considered for possible release must be feasible condi-

11. *United States v. Vortis*, 785 F.2d 327, 328–29 (D.C.Cir.), *cert. denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986).

12. 18 U.S.C. § 3142(f).

13. 18 U.S.C. § 3142(e); *Tortora*, 922 F.2d at 884.

14. *Tortora*, 922 F.2d at 884; S.Rep. No. 98–225, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3195.

15. *DiGiacomo*, 746 F.Supp. at 1181.

16. 18 U.S.C. § 3142(e).

17. *Tortora*, 922 F.2d at 888.

18. *DiGiacomo*, 746 F.Supp. at 1182.

19. *Tortora*, 922 F.2d at 885 n. 6.

20. *See DiGiacomo*, 746 F.Supp. at 1182 and cases cited therein.

tions, not conditions that are unduly burdensome for the Government, or unduly expensive, or conditions which would require extraordinary, heroic efforts to implement.[21]

But as Judge Breyer said, correctly I think, in his concurrence in the *Tortora* case, whether conditions are reasonable depends to a certain extent on the circumstances of the case.[22] As he put it, "Where two or three years of pretrial detention is at stake, and detention is in a distant facility, requiring counsel to drive several hours to confer with his client, conditions that impose cost burdens upon the government might well seem more 'reasonable' than in more usual circumstances." [23]

■ In addition, I note that the combination of conditions imposed must, to my satisfaction, reasonably assure the Defendant's appearance and the community safety. But it is not necessary, appropriate or correct for me to require that those conditions guarantee his appearance or the safety of the community. What is required is a reasonable assurance.[24] In connection with this, ultimately this Court and, indeed, any court must make a judgment. A judgment must be made whether the defendant will observe the conditions of release.

As I'll describe later, Judge Selya, in the *Tortora* opinion, expressed the view that many of the conditions in that case, which were adapted from my decision in *DiGiacomo*, relied on the good faith of the defendant to comply.[25] I would choose somewhat different words to express what this decision relies on. I am not necessarily relying on Mr. Patriarca's good faith. I am, however, to a certain extent, as I will describe in detail, relying on his ability to discern what is in his best interest and to conform his conduct to that.

I think that there are powerful factors now coming into play that should effectively discourage Mr. Patriarca from trying to violate any of these conditions. It would be a terrible mistake, with potentially devastating consequences for the rest of his life and his association with his family, for him to attempt to violate any of these conditions. As I will describe, I am to a certain extent relying on his ability to appreciate that and to be deterred by the potentially drastic consequences that will follow if he surprises and disappoints me and seeks to violate any of these conditions.

I have some question of whether it is necessary and appropriate to make the following observation, but I guess I will, since there is some public interest in this. I have gone through these standards in very great detail before getting to the particulars in this case for a combination of reasons. First, I wanted to try to understand the applicable standards as clearly as I could myself in an effort to properly apply them.

In addition, I have hoped by this review to assure both the Government and the Defendant that they have received both the benefits and the burdens of the applicable law, including the requirement that judgments be made individually based on the evidence presented.

And a matter like this does require judgment. There is a certain at least superficial temptation to simply say where, as here, there is compelling evidence that the Defendant was a "Boss" of a substantial Mafia family, that he must be dangerous and he must be detained. Indeed, there may be members of the public and others who would think this way and anticipate such a result.

But in our system, even alleged Mafia bosses have the same rights as others, and that includes the right to careful consideration regarding their detention and candid judgments based on the evidence and the unique aspects of their particular cases.

I do not believe I am unusual among United States District Judges in having the view that courts should not be inhibited

21. *Tortora*, 922 F.2d at 887.

22. *Id.* at 895 (Breyer, C.J., concurring).

23. *Id.*

24. *Id.* at 884.

25. *Id.* at 886.

about releasing even notorious alleged criminals, if the release is otherwise justified, because of a concern that the court's decision will be publicly misunderstood or possibly even unwelcome. As Felix Frankfurter once wrote, "A timid judge, like a biased judge, is intrinsically a lawless judge."[26] And in this country, I don't think anybody would care to have lawless judges.

So in this case, based upon the facts described below, I find the Government has not proven that there is not a combination of conditions which will reasonably assure the Defendant's appearance in the future and the safety of any individual or the community. Rather there are a combination of reasonable conditions on which the Defendant may be released, and subject to possible appellate review and reversal, I am ordering that Mr. Patriarca be released on those conditions.

The statute is explicit about the factors that are to be considered at this point.[27] First, I must consider the nature and circumstances of the offense charged.

The Defendant here is charged with two RICO offenses and five counts of travelling in aid of racketeering. At least two of those alleged travel act violations relate to extortion and credit transactions, which are crimes of violence under 18 United States Code Section 3156(a)(4)(A), and thus consideration of the Defendant's detention, or continued detention, is triggered.

There is no evidence, however, that the Defendant has ever personally engaged in any acts of violence. Nor is he charged, as some of his co-defendants are, or some of his former colleagues have been, with obstruction of justice. Similarly, the Defendant is not charged with any drug offense.

The essence of the RICO charge in this case is that the Defendant was the Boss of the Patriarca family of the LCN. That name derives from his late father, Raymond L.S. Patriarca, who was long understood to be the Boss of the New England organized crime family which came to bear his name.

The Government has stipulated, however, that the present Defendant, Raymond J. Patriarca, has since his indictment been demoted.[28] He is no longer the Boss of an organized crime family. Nevertheless, I do recognize, as I said earlier, that Mafia membership at any level entails a degree of potential dangerousness.

In this case, the Probation Department has preliminarily calculated the Defendant's Guidelines, should he be convicted, as 63 to 78 months. The charges against him, therefore, would ordinarily, absent exceptional demonstrated circumstances, result in a term of incarceration of about five to six years.

The Government has already signalled its intention, however, not only to obtain the Defendant's conviction, but to seek an upward departure. Nevertheless, it is inherent in the nature of the Guideline system that if one reaches the sentencing stage, the Guideline sentence is presumptively the appropriate sentence.

But if the Defendant goes out on his conditions of release and violates any of those conditions, for reasons I'll describe, it is very likely he's going to get caught, and as a result, it's very likely he is going to face a longer sentence, perhaps a considerably longer sentence, than the Guidelines would prescribe.

Another factor which I am called upon to consider is the weight of the evidence against the Defendant in this case. At this point, the evidence relating to the alleged Travel Act violations is of uncertain weight. The evidence, however, that the Defendant was the Boss of the Patriarca family is strong. It includes, among other things, the tape recording of the October 29, 1989, induction ceremony, which I have ruled will be admissible.[29]

**26.** *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1949).

**27.** 18 U.S.C. § 3142(g).

**28.** Stipulation of the Government by Letter dated May 9, 1991 (under seal).

**29.** Memorandum and Order dated April 15, 1991, corrected April 17, 1991.

There are, however, no known testimonial witnesses, that is no testimony of witnesses known to me, that the Defendant would have cause to threaten if he were released. This would also be particularly unavailing, since even in the absence of any human witnesses, the tape-recorded evidence against the Defendant would remain strong on the most substantial of the charges against him.

The statute also calls upon me to consider the history and characteristics of the Defendant.

Mr. Patriarca is 46 years old. He's married. He has one son, who is very important to him.[30] He is a lifelong resident of Rhode Island. He, his wife, his stepmother, and his cousin have substantial equity in real estate and their personal residences, which have been offered as surety for his release. I am informed that the Defendant and his relatives are willing to pledge property worth over four million dollars with the understanding that that property will be forfeited if the Defendant violates any condition of his release.

In addition, the evidence persuades me that in addition to the criminal activity I will describe later, in the 1980s, the Defendant also managed the Kendall Construction Company in Rhode Island. There are letters from a number of individuals personally attesting to the fact that the Defendant was actively involved in developing Kendall Estates in Lincoln, Rhode Island.[31] Thus, while the evidence suggests strongly Mr. Patriarca's involvement in organized crime, it also indicates to me that was not his exclusive occupation prior to his arrest.

The Defendant has no history of drug or alcohol abuse. I have observed him, and he seems rational. As I said earlier, I discern that he is capable of calculating what is in his best interest and acting accordingly.

As I also mentioned earlier, the Defendant suffers from recurrent bladder cancer.[32] He has most recently suffered such recurrences on May 25, 1990, December 18, 1990, and April 11, 1991.[33] This condition requires cystoscopy every three months and prompt removal of any tumors that have developed in that period.[34] Those procedures must be conducted by a board-certified urologist.[35]

In addition, Mr. Patriarca's doctors at the Emerson Hospital in Concord, Massachusetts, indicate that he may need to be subject to chemotherapy if his cancer continues to recur frequently.[36] As I will explain later, this condition is relevant to whether the Defendant would or could flee, or would run the risk of violating any other condition designed to assure the safety of the community.

The Defendant has no criminal record. He was not on release at the time of the alleged defense. He has received several grand jury subpoenas over the years and has responded as required to each.

Despite, however, the lack of criminal convictions, the evidence in the case indicates that Mr. Patriarca was long involved in criminal LCN activity. I find that he has no record in part because while he was the Boss of a Mafia family, he could rely on others to commit substantive crimes. But he has been demoted and no longer has agents that he can direct by virtue of his position.

With regard to the Defendant's pre-indictment criminal activity, the evidence at this point suggests the following, and this is necessarily quite preliminary. I'm called upon to make some assessment, based on the evidence and information given to me, of some facts that are also alleged in the indictment. It is simply in the nature of these matters that that's required. Inevi-

---

**30.** May 13, 1991 Transcript, Oral Statement of Raymond J. Patriarca.

**31.** Defendant's Exhibit P.

**32.** Defendant's Exhibit H, May 3, 1991 letter from Dr. James Ellis, Emerson Hospital, Concord, Massachusetts.

**33.** *Id.*

**34.** *Id.*

**35.** *Id.*

**36.** *Id.*

tably, I have to make references to certain other Defendants. These are not gratuitous. They are central to describing the situation as I, at present, perceive it. As this case evolves, I, and perhaps more importantly a jury, may certainly perceive it differently. But I have to decide this motion on the evidence and information presented to me, and I find the following.

The Defendant's father, Raymond L.S. Patriarca, was for many years a powerful Boss of the New England LCN family which still bears his name. Perhaps like many fathers, he tried to get his son involved in the family business. Perhaps like many sons, Junior did not have the aptitude for that business that his founding father had.

In 1967, the present defendant, Raymond J. Patriarca, was in court in this building when United States District Judge Francis Ford let his father out on bail pending appeal after his conviction.[37] His father ultimately reported as required to serve his sentence in that case.[38]

In 1981, Raymond L.S. Patriarca was very ill.[39] He was not then able to deal directly with the family members in Boston. And when I say that, I mean LCN family members in Boston. Some of those individuals were attempting to communicate with Raymond L.S. Patriarca through his son, Raymond J. Patriarca. Mr. Patriarca, Sr., however, directed that everyone under him in Boston report to him through Nicholas Bianco.[40]

Raymond J. Patriarca, the present Defendant, came to Boston to explain that to members of the LCN. As he put it at that time, he could not stand being his father's agent in dealing with LCN members in Boston. It was simply too much trouble

for him. He didn't want to do it. So Mr. Bianco was made the intermediary with Boston during his father's illness, instead.[41]

Without getting into much detail, I also find that Mr. Bianco is an individual who has had organized crime connections in New York, Rhode Island, and Connecticut, where he is now on trial.[42]

Apparently, many people expected Mr. Bianco would succeed Raymond L.S. Patriarca when the latter died in 1984.[43] The present Defendant, known as Junior, however, succeeded his father as Boss.[44] In August 1984, he visited Mr. Zannino, who had just been released pending trial in this court, I recognize, and declared that he, Raymond J. Patriarca, had succeeded his father, and that Mr. Zannino would be the Consigliere of the family.[45] That is a factor that I have considered as militating against release, but it is obviously not the only factor I've considered.

I find essentially that the Defendant inherited his position as Boss and did not earn it. There are many pieces of information that lead me to that conclusion for present purposes. Among them are the statement of Vincent Vespia, a former Rhode Island State Police organized crime investigator, who in one of the exhibits presented to me is quoted as saying that "Junior did not have the brains or the power to the lead the family. Had his father not come before him, he wouldn't have got the job. He couldn't lead a Brownie troop." [46]

By the mid 1980s, the Government had successfully prosecuted the known hierarchy, or substantially all of the known

---

**37.** May 13, 1991 Transcript, Oral Statement of Raymond J. Patriarca.

**38.** *Id.*

**39.** April 6, 1990 Affidavit of Supervisory Special Agent James A. Ring In Support of Pretrial Detention of Raymond J. Patriarca, Carmen A. Tortora, and Pasquale Barone (under seal), ¶ 10 ("Ring Aff. ¶ ___").

**40.** *Id.*

**41.** *Id.*

**42.** Indictment in *United States v. Bianco, supra;* Defendant's Exhibit F.

**43.** *See, e.g.,* Defendant's Exhibit F–1.

**44.** Ring Aff. ¶ 28.

**45.** *Id.*

**46.** Defendant's Exhibit F–1.

hierarchy, of the LCN in Boston.[47] Those convictions greatly weakened the Patriarca family.

Throughout the 1980s, the Defendant here has been under constant FBI surveillance. In 1986, he was subject to the bugging of a car that he regularly used. The Government believes he knew that car was bugged. He did not flee.

On other occasions, he was subpoenaed to appear before various grand juries, as I mentioned earlier. On each occasion he appeared rather than flee.

In addition, since at least 1986, he has actively worked to develop Lincoln Estates, a real estate development in Rhode Island. And in that period, he was involved in LCN activities.

It appears that under the standard procedures of the LCN, the Defendant was supposed to get a percentage of the money obtained by members of the Patriarca family in Boston. But the record is replete with evidence that the Boston members of that family, including a number of co-defendants here, regularly resisted making such payments.[48]

For example, the record includes a January 1987 tape recording at Vanessa's of the extortion of five hundred thousand dollars from a bookmaker named Doc Sagansky. On that transcript, Mr. Lepore is overheard calling "Junior" a "bonehead." [49] Mr. Lepore and Mr. Ferrara engage in a conversation which the FBI interpreted as a discussion of how to keep Junior from finding out that they had extorted five hundred thousand dollars, so they would not have to give him a share.[50]

The strife and resistance within the Patriarca family to Junior's leadership apparently grew in the late 1980s. The information presented to me suggests that after consulting organized crime figures in New York, Mr. Russo and members of his faction participated in causing the shooting of William Grasso and Frank Salemme, who were perceived to be key allies of Raymond J. Patriarca in the LCN.[51] Some of those individuals, I understand, are unindicted co-conspirators on those charges in the Connecticut case.

As testimony in Mr. Bianco's ongoing trial in Connecticut, among other things, indicates, in the summer of 1989, Mr. Bianco replaced the deceased Grasso as the Underboss of the Patriarca family.[52]

The information presented to me also indicates that in the summer of 1989, Mr. Russo and others met with Raymond J. Patriarca and threatened to kill him if he didn't step down as boss.[53] This caused Mr. Patriarca, perhaps understandably, to have tears in his eyes and beg for his life and for his safety and the safety of his family.[54] Thus it appears that the Defendant's power had substantially diminished by September 1989. Indeed, the FBI spoke to him about the danger to him in this

47. *See e.g., United States v. Angiulo*, 897 F.2d 1169 (1st Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Zannino*, 895 F.2d 1 (1st Cir.), *cert. denied* — U.S. —, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

48. *See, e.g.,* Defendant's Exhibit Q.

49. Defendant's Exhibit AA.

50. Defendant's Exhibits Q and AA.

51. *See, e.g.,* October 27, 1989 Affidavit of Special Agent Walter J. Steffins, Jr. In Support of Application for Electronic Surveillance Order in M.B.D. 89–1015, ¶ 10 ("Steffins Aff. ¶ __").

52. Testimony of John Castagna in *United States v. Bianco,* Cr. No. H–90–18 (AHN), excerpt attached to Government letter dated June 20, 1991.

53. *Id.;* The government has failed to prove by clear and convincing evidence that the shootings of Grasso and Salemme, and the threats against Mr. Patriarca occurred in response to an order from Mr. Patriarca that Vincent Ferrara be killed. Some of Mr. Patriarca's co-defendants may have believed that such a direction was given and discussed this perception with others. There is, however, no evidence that any effort to harm Mr. Ferrara was made. There is circumstantial evidence suggesting that the FBI did not believe that Mr. Ferrara was in any danger.

54. Testimony of John Castagna in *United States v. Bianco,* Cr. No. H–90–18 (AHN), excerpt attached to Government letter dated June 20, 1991.

period. The Defendant, however, did not flee.

The Defendant did cede a meaningful measure of power in the family in Boston to Mr. Russo and his colleagues.[55] This is reflected in the tape of the October 29, 1989, induction ceremony, and elsewhere. But the Defendant, as the Government emphatically points out, also maintained the title of Boss of the Patriarca family, and his membership in the LCN.[56]

On October 29, 1989, a Mafia induction ceremony was held on Guild Street in Medford, Massachusetts, across the street from the home of an FBI agent.[57] The Defendant was present. He was introduced at the ceremony as the Boss of the family. He presided. From his participation in that ceremony, among other things, I infer that he, like the inductees, took an oath at some point in his career, and that oath included swearing his lifelong paramount loyalty to the Mafia.

Also for present purposes, although it is not part of the formal oath that was administered to the inductees, I assume that the Defendant either explicitly or implicitly agreed to kill informants on behalf of the LCN if he were ever instructed to do so. But I also find that no one is likely to order this Defendant to kill anybody. He has no penchant or personal aptitude for violence.

I also note that at the ceremony, among other things, this Defendant told the new members that Mafia membership "is not a ticket to abuse people."[58] Members, he said, should rely on each other for protection but not for the abuse of other people or to make money.[59]

In any event, as I said earlier, there are no live witnesses needed, apparently, to make a compelling case against Raymond J. Patriarca. He is not likely to be ordered to commit a crime, and I find he's not likely to obey any such order if he receives one.

In November of 1989, Mr. Russo and some of his present co-defendants were indicted in the predecessor to this case. At that time, there were rampant published rumors that Raymond J. Patriarca would also soon be indicted.[60] He did not flee.

In March 1990, he was indicted in this case. Subsequently, the Defendant has been demoted from Boss of the Patriarca family to the entering rank of soldier. It appears that this demotion resulted in part because the Defendant was responsible, as the presiding officer, for the interception of the LCN induction ceremony, which apparently caused an unprecedented compromising of the organization's sacred secrets.

The Government and the Defendant have agreed that a particular individual, whose name remains under seal, has been designated to succeed Raymond J. Patriarca as Boss of the New England family.[61] I find that that is a person who has long established LCN contacts in Rhode Island, Boston, Connecticut and New York.

I have analyzed the questions of risk of flight and dangerousness separately. I find that the Government has not proved by a preponderance of the evidence that the combination of conditions I will be imposing will not reasonably assure this Defendant's appearance in the future.

First, I find the Defendant presents little risk of attempting to flee. I recognize that some LCN members have fled in anticipation or in response to charges against them. Mr. Russo apparently spent some time in Montreal for fear of forthcoming charges. Mr. Mercurio is a fugitive. I recognize this happens.

I also recognize, however, that many substantially similarly-situated defendants have not fled. Mr. DiGiacomo, Mr. Spag-

---

**55.** *See* Transcript of October 29, 1989 interceptions at 34 Guild Street, Medford, Massachusetts (under seal) ("October 29, 1989 Tr. ___").

**56.** *Id.*

**57.** March 25, 1991 Transcript, Testimony of Assistant United States Attorney Diane Kottmeyer.

**58.** *See* October 29, 1989 Tr. Y–5, page 14.

**59.** *Id.*

**60.** *See, e.g.,* Defendant's Exhibit 1, received in court May 9, 1991.

**61.** Stipulation of the Government by letter dated May 9, 1991 (under seal).

nolo, Mr. Gioachini, who appeared before me, did not flee, and indeed presented no difficulty for Pretrial Services. Nor, as I mentioned earlier, have the eight defendants released in the companion Bianco case in Connecticut fled since their release.[62]

I do recognize that the Mafia has resources to facilitate flight. It is a far-flung organization with money.[63] I also am persuaded that for at least a period of time, the Patriarca family assisted Salvatore Michael Caruana in his flight from trial in this court.[64]

I do not find, however, that the Government has proven by a preponderance of the evidence that this Defendant personally participated in that effort generally, or specifically that this Defendant gave one hundred thousand dollars to Mr. Caruana to facilitate that flight.

I have read the affidavit of Special Agent Ring, which was filed and will remain under seal. It is the affidavit dated April 23, 1990. It was sealed by the magistrate on May 3, 1990.

I note with regard to the contention that Mr. Patriarca gave Mr. Caruana one hundred thousand dollars, there appears to be only a single source for that information.[65] The allegation is in some doubt because of the suggestions in United States v. Hurley, as well as elsewhere, that Mr. Caruana had a considerable amount of cash.[66] But in any event, that's a particular fact which might or might not be true, but I don't find it proven by the information submitted to me.

More importantly, however, is my present sense that the LCN is not likely to assist Mr. Patriarca in any effort to flee. It is my understanding that Mr. Patriarca's lieutenants, Mr. Grasso and Mr. Salemme, were shot after consultation with LCN powers to be in New York, and that subsequently Mr. Patriarca was urged to resign as Boss.

It is my view that this Defendant was not in good standing with the LCN, before the October 29, 1989, Mafia induction ceremony, and he has been demoted since because of the organization's displeasure. Candidly, I would think that the LCN would be more likely to harm the Defendant than help him if he tried to flee, and that it would be dangerous for him to rely on any offers of assistance. I think he appreciates that danger.

In addition, I find that the Defendant does not have a propensity to flee. He did not flee when he knew he was subject to electronic surveillance. He did not flee, again, when he was subpoenaed to appear before various grand juries. He did not flee in 1989 and '90 when there were rampant, accurate public reports that he would be indicted imminently.

In addition, there are formidable factors which should effectively deter Mr. Patriarca from responding to any inclination he might have to flee. He is a lifelong resident of Rhode Island. He has strong ties to his son. Any effort to flee would almost certainly cause the forfeiture of over four million dollars of property, including the residences of his wife, his stepmother, and his cousin.

I will say that it is credible to me that even defendants charged with crimes like those in this case have respect for their families and would be influenced by the injury that their future misconduct could impose on those people. Superficially, or maybe more than superficially, that could strike somebody as a sort of naive belief, but some of the evidence on the tapes, when these people are talking and don't know they're being overheard, is entirely consistent with that assessment.

For example, I mentioned earlier the tape recording made following the apparent ex-

---

62. May 10, 1991 Tr. at 133–34.

63. DiGiacomo, 746 F.Supp. at 1187.

64. Ring Aff. ¶ 58.

65. April 23, 1990 In Camera Affidavit of Supervisory Special Agent James A. Ring (under seal), pages 12–13.

66. Defendant's Exhibit Z.

tortion of Doc Sagansky at Vanessa's.[67] I was very struck by the conversation that Mr. Ferrara had with Mr. Mercurio.

Mr. Mercurio was saying that he really was glad to have that forty thousand dollars. He would like to go out and buy his daughter, who apparently was on welfare, a house. Mr. Ferrara said to him, "Well, you know, your top priority is going to be to go someplace where the schools are good and there are no drugs." They talked about how you can't find any school these days that has no drugs, but some are better than others. They did come down as their first choice with a community that not only had good schools and few drugs, but one that was close to the North End so Mr. Mercurio could get to work promptly.[68] It's not an entirely promising message.

But Mr. Patriarca and, indeed, his codefendants are not one-dimensional cartoon figures. The longer we spend together, the more evident it is that they are people, and their conduct is in question, but they are not utterly without ordinary, positive, human values. For some of them, at least, family ties are compelling.

Mr. Patriarca's family is going to go way out on a limb for him, because it's evident that the Government would have tremendous enthusiasm for owning and occupying all of those houses in Rhode Island. And it should be evident that I am going to be more than disappointed if my prediction proves to be incorrect regarding Mr. Patriarca's willingness and ability to comply with these conditions.

With regard to flight, I have also taken into consideration the Defendant's cancer. It would be risky, particularly risky, for him to flee because he needs regular treatment, and it is natural that he would want that treatment from his regular doctors, who are familiar with his condition.

There are, I recognize, other board-certified urologists around the world who would be capable of caring for the Defendant, if he could find them. But that need to have that kind of service would make it easier to find him if he got that far. I don't think he would.

The Defendant will be subject to electronic monitoring. The testimony of Nancy Long of Guardian Technology and of Alan Chipman of the Pretrial Services Department of this court have amplified my understanding, influenced somewhat by some familiarity with this matter of electronic monitoring as a result of my service on the Criminal Law Committee of the Judicial Conference.

Without trying to cover all of the testimony, or conclusions I derived from the testimony in this area, I will say the following. The Defendant would be given highest priority if released on electronic monitoring.[69] There are only two other figures who are now receiving that extra special attention. They are Peter Gotti in Florida and Thomas Gambino in New Jersey. Both are alleged organized crime figures.[70] Both have presented apparently no problems for Guardian Technology since released on these bracelets.[71]

The computer, which would receive information and monitor Mr. Patriarca's presence in his home, would detect his flight in five minutes.[72] Pretrial Services, and pursuant to the order I'll issue the Marshals in Rhode Island, would be notified promptly and would know that in ten minutes.[73] The Defendant, if he tried to flee, would be quickly pursued.

Around the time of the hearings on this motion, the first Defendant released on electronic monitoring in Massachusetts to successfully, temporarily flee took off. That was Mr. Walter Bagley. The testimony indicates to me, however, that there was a combination of circumstances in Mr. Bag-

67. Defendant's Exhibit AA.

68. *Id.*, pages 14–17.

69. Testimony of Nancy Long, May 10, 1991 Tr. at 66.

70. *Id.*

71. *Id.*

72. *Id.* at 67.

73. *Id.*

ley's case which will not be repeated here and will not present the same risk here.[74]

It was a matter of human error that permitted Mr. Bagley to escape without detection by the electronic monitoring service. He was allowed to leave every day his home to meet with his attorney, and Pretrial Services failed to program in a specific time for him to return, so the computer did not show him missing when he failed to return one day.[75]

Mr. Patriarca is not going to be allowed to leave to consult his attorneys. They will come and visit him. He will be allowed to leave for essential medical appointments. The beginning and ending times of those visits will be established by Pretrial Services, and either Mr. Cicilline or Mr. Weinberg will have personal custody of the Defendant in those periods. If he's going to go in that period, he should take his lawyers with him, because they're not going to want to be back in front of me.

But the precise time for his authorized period away from his home and his electronic monitor will be scheduled, and the bracelet will indicate whether he has tampered with it or attempted to flee.

Basically, however, as the Government counsel very skillfully developed both in court and in the confidential session in the lobby, the electronic monitoring is not infallible.[76] I don't believe that Mr. Patriarca has the capacity to circumvent it secretly. He, like any defendant, could cut it and run.

I'm relying in part on the electronic monitoring, but much more on my judgment that he will not attempt to flee, and my clear expectation that: if he does, he will be caught; he will be subject to a considerably longer sentence, which given his physical condition, particularly his cancer, could in effect be a life sentence, or indeed a death sentence; and that he's sensible enough not to want to run that risk.

With regard to danger, I find that the Government has not proven by clear and convincing evidence that the combination of conditions I am imposing will not reasonably assure the safety of any person or the community.

As I indicated earlier, the evidence does not indicate to me that the Defendant's release will pose a threat to any particular person. The strongest evidence against him is the tape recording of the October 29, 1989, induction ceremony. Thus he has little incentive to threaten or to try to harm anyone.

In addition, as I've noted, the Defendant does not have any personal history of violence. Indeed, he urged other individuals at the LCN induction ceremony not to abuse other people.

Furthermore, Mr. Patriarca is no longer the Boss of an LCN family. He does not have the authority to order others to commit violent acts on his behalf, although I recognize that he may still have friends and associates who will do him a favor if he asks them. I don't expect he's going to ask them.

The Defendant does remain a member of the Mafia. He did not abdicate his position as Boss when Mr. Russo threatened him. And, as the Government repeatedly reminds me, while he has been demoted, he has not been expelled or resigned. I infer from the tape of the induction ceremony that Mr. Patriarca, like the inductees there, took an oath which, among other things, caused him to pledge that only death would end his membership in this organization.

But I also find on the information presented to me that the Mafia in New England is now an organization with greatly diminished power as a result of the Government's investigations and prosecutions in the past decade. Indeed, as the very experienced and able United States Attorney in Rhode Island, Lincoln Almond, reportedly said in one of the exhibits presented to me, "The cases against Mr. Patriarca and his associates have left the

---

**74.** *Id.* at 58–59.

**75.** *Id.*

**76.** *Id.* at 97.

mob virtually powerless."[77] Some of his colleagues in the Department of Justice undoubtedly would dispute that characterization, but I am of the judgment that if released, Mr. Patriarca will be an inactive member of this diminished Mafia.

More specifically, with regard to one of the arguments that the Government made most emphatically, and I will say it's an argument that I considered with particular care, the Government has not proven by clear and convincing evidence that Mr. Patriarca will engage in crimes to the detriment of the community if released by communicating valuable information to his successors in the LCN to facilitate any transition of power.

He is going to be permitted to speak directly or through others, and communicate directly or through others, only with a limited number of people. None of those people will, to the Government's knowledge, or to mine, be LCN figures.

In addition, and perhaps more importantly, I am not persuaded that this Defendant knows anything that would be valuable to his successor. His successor, as I understand it, is a person with experience in the LCN, and he has long-standing contacts with organized crime figures in New York, Connecticut, Rhode Island and Boston. I don't find that the Defendant is likely to be asked for any help, partly because he was out of favor before the induction ceremony, and certainly further out of favor now.

In addition, however, I expect that even if the Defendant is asked to violate any of the conditions of his release order restricting his communications, he will, despite his oath, be effectively deterred from doing so. The Defendant has offered, and will agree, that the over four million dollars to be pledged as surety for his release will be forfeited not only if he flees but if he violates any condition of his release. That includes the condition that he engage in no crimes and have no criminal discussions,

and it includes the requirement that he not communicate directly or indirectly with anybody not authorized by this Court.

As the First Circuit noted in the *Tortora* case, there may be some question as to whether I could impose this requirement without the Defendant's agreement and require forfeiture of property for violation of conditions other than a failure to appear.[78] But it is my understanding that there is no serious question that that condition can be imposed by agreement.[79] The Defendant, through his counsel, has repeatedly represented he wished to make that agreement, and I'm relying on that agreement.

As I said, if the Defendant is detected engaging in unauthorized communications or other violations of conditions, there is a significant risk that his wife, his stepmother and his cousin will be out of their homes and forfeit property of over four million dollars.

In addition, there is a foreseeable likelihood that any violation will cause the Defendant, should he be convicted, to get a considerably longer sentence than the 63 to 78 months the Guidelines suggest is usually the appropriate sentence.

I will also say that in my view, and I hope in Mr. Patriarca's view, it is foreseeable that he will be caught if, while released, he engages in any crime or conducts any unauthorized communications. Because basically, if you look back over the last ten years, the LCN has a dismal history of avoiding detection. You can go back to Mr. Anguilo's headquarters at 98 Prince Street being bugged and the convictions that generated,[80] and you can look at the Mafia induction ceremony on October 29, which was successfully bugged as well, and has brought some of these Defendants here.

I would point out, and amplify in a moment, that everything I have been hearing recently in the last two weeks indicates

**77.** Defendant's Exhibit Y.

**78.** *Tortora,* 922 F.2d at 886–87 n. 8.

**79.** The Office of the United States Attorney for the District of Massachusetts has entered into at least one such agreement previously. *See* Defendant's Exhibit G, Escrow Agreement in *United States v. Charles Pappas,* 90–10245–T.

**80.** *See Angiulo, supra.*

that the confidential informants who contributed so much to generating the electronic surveillance and other evidence as part of the present indictment are still out there working, and they're working rather effectively.

In addition, defense counsel have expressed the concern that even the incarcerated defendants are subject to continued electronic surveillance, and the Government has declined to confirm or deny that. But all of the evidence that I've been asked to suppress, and I haven't suppressed any yet, is compelling testament to the Government's continuing ability to intercept conversations that people who think they're being careful are having. And the FBI and other law enforcement officers will be permitted to randomly visit the Defendant.

So the Defendant may not be brilliant, and probably none of us are, but I trust that he's smart enough to recognize that it would not only be wrong to violate the conditions on which I'm releasing him, it would be very dumb. Because it is very likely, Mr. Patriarca, that if you try to do that, you're going to get caught again, and it's going to have devastating consequences for you and your family.

With regard to the conditions, as I said, I understand in reading the *Tortora* opinion, among other things, those conditions have to be reasonable, and it's not appropriate to require the government to engage in heroic measures in an effort to reasonably assure the safety of the community if the defendant is released.[81] But what is reasonable may depend on the circumstances of the case,[82] and I feel comfortable that the conditions here are reasonable.

The electronic monitoring will address the issue of flight rather than danger. It is not perfect, but as employed in this case, it will be reliable, in my view, in promptly detecting flight. Indeed, Judge Selya came to the same conclusion on this point in *Tortora*.[83] In addition, as I've explained, I am relying on other formidable factors to deter flight in my assessment that the Defendant is reasonably assured of appearing in the future if released on these conditions.

I also recognize, however, that as the Court of Appeals said in *Tortora*, electronic monitoring will not effectively prevent the Defendant from committing crimes within the monitoring radius, basically within his house, if he's determined to do so.[84] I am not relying on electronic monitoring for that. Nor, as I said earlier, am I relying on the Defendant's good faith. I am not at the moment assuming that the Defendant's apparently criminal character has been reformed, that he has been reborn as somebody who is incapable of dishonesty.

But with regard to danger, once again, I'm relying on the Defendant's present status in the LCN, and particularly on his ability to discern that it is not in his interest to violate conditions of release, and his ability to act on that understanding.

It would not take heroic measures for the Government to detect any violation of the conditions I'm imposing. As I said, there is every indication that the superb sources and confidential informants who have generated the evidence and the basis for electronic surveillance relating to this indictment are still out there working for the Government.

There may now be Title III electronic surveillances in place or Title III surveillances that will be put in place. The FBI can watch the Defendant's house, and I may take up the offer that the Defendant called "James Bondish," to have him turn on his machine and videotape everybody coming in and out of his house.[85]

The Government has had Mr. Patriarca under the most intense surveillance and investigation over the past ten years. Pretrial incarceration is costly. I think it would probably only cost a fraction of what

---

**81.** *Tortora,* 922 F.2d at 887.

**82.** *Id.* at 895 (Breyer, C.J., concurring).

**83.** *Id.* at 887.

**84.** *Id.*

**85.** May 13, 1991 Transcript, Oral Statement of Raymond J. Patriarca.

was invested prior to his indictment, and perhaps even a fraction of what it would cost to keep him in Danbury to check up on him in an effective, efficient way.[86]

If the Government is correct and my prediction is not prophetic, if the Defendant, despite what I discern, seeks to flee or violate any of the other conditions, then I think if the past is prologue, as everybody seems to like to say in this case, he won't disappear and he won't be dangerous. If the past is prologue, the Government will catch him again and come before me with a far more formidable case for a much longer sentence. But it is my present prediction that is not what will occur.

Between now and the close of business on Wednesday, I would like counsel to confer with each other and Pretrial Services, using my order in the DiGiacomo and Spagnolo cases as a model to try to draft either a joint proposed order implementing this decision or, if necessary, alternative submissions.

When I say that, I note that the reported decision in *DiGiacomo* doesn't include the complete order.[87] I'll have to get you one of the amendments, because the Government decided that the pen registers that it had initially suggested if the defendants there were going to be released were not cost or time efficient, and there was substituted an alternative provision for random visits by law enforcement.

The Defendant some time ago submitted a list, a short list of people with whom he wished to be authorized to communicate. The Government asked for some additional time to respond with any possible objections and to not be required to respond unless the Defendant was ordered released. Now is the time to respond, and I would like you to inform me of any objections

that you have by the close of business next Wednesday.

If it's essential, I'll see Mr. Weinberg and the Government counsel next Friday. But it's my hope that on this record, I will be able to finalize this Opinion and issue an Order by the close of business next Friday.

I expect that it will take some time for the sureties to post the property. In addition, some care is going to have to be taken so the agreement and the explanation of the agreement to make the sureties vividly clear to them that their property will be forfeited not only if Mr. Patriarca flees, but if he violates any of the conditions concerning participating in a crime or communicating with people he's not authorized to communicate with.

I'm not sure that I feel that the language in the Pappas order that the Government and another of Mr. Weinberg's clients entered into to effectuate this type of agreement is vivid enough. I would like it to be more explicit.

In any event, assuming I issue this Order and Opinion next week, I intend to stay Mr. Patriarca's release two weeks so that the Department of Justice in Washington, as well as here, can make an informed decision on whether to seek appellate review and whether to seek a further stay from the Court of Appeals. Thus, it does not appear likely that the Defendant will be released before July 12, at the earliest, and as far as I'm concerned, he can be returned to Danbury if that's his desire, and the Marshals can accommodate him in this period.

As I said, it's also my intention to schedule a hearing in this matter about 60 days after the Defendant is released, assuming that my decision stands, so I can be brought up to date on whether he has complied with the conditions of his release,

---

**86.** In the event that this statement requires clarification, the court did not intend to suggest that intense or expensive surveillance of the defendant by the government will be necessary to assure the safety of the community. Rather, the court believes that the government's present investigation of LCN activity, which will continue without regard to whether Mr. Patriarca is released, is likely to detect any violation of defen-

dant's conditions of release. In addition, the random visits authorized as a condition of Mr. Patriarca's release should operate both as a deterrent to any violation and as an efficient additional means of detecting any violation.

**87.** *DiGiacomo*, 746 F.Supp. at 1190–99.

and be informed about whether either the Government or the Defendant seeks any modification of his status.

That concludes my decision in this matter.

## ORDER

For the reasons described in detail in court on June 21, 1991, the Court has determined that there are a combination of conditions of release which will reasonably assure that the Defendant Raymond J. Patriarca (the "Defendant") will appear as required in the future and which will reasonably assure the safety of the community. Accordingly, it is hereby ORDERED that on or after July 15, 1991, if the prerequisites for his release stated in this Order have been satisfied, the Defendant shall be released on the following conditions.

1. The Defendant shall not commit any violation of federal, state, or local law while on release in this case.

2. The Defendant shall appear at all proceedings as required and shall surrender as directed to serve any sentence imposed.

3. The Defendant shall reside at his house at 478 Angell Road, Lincoln, Rhode Island 02865. Defendant is restricted to his residence at all times, subject to electronic monitoring. The Defendant may, however, leave his residence for medical appointments with prior approval of Pretrial Services, obtained at least 24 hours in advance, or for medical emergencies with the permission of Pretrial Services. Any time Defendant leaves his residence for a pre-arranged medical appointment he shall be in the custody of, and accompanied by, one of his attorneys, John F. Cicilline, Esq. or Martin G. Weinberg, Esq. In the event of a medical emergency and the unavailability of both Mr. Cicilline and Mr. Weinberg, Defendant may, with the prior approval of Pretrial Services, be transported directly from his residence to a hospital. A Pretrial Services officer will immediately leave his or her office or residence to meet Defendant at the hospital. Additionally, either Mr. Cicilline or Mr. Weinberg, whoever is closer, will also immediately travel to the above-mentioned place of hospitalization and remain with Defendant until alternative arrangements, approved by Pretrial Services, can be made. Upon discharge from the hospital, Defendant shall return directly to his residence in the custody of Mr. Cicilline or Mr. Weinberg.

4. Defendant shall enter into the Electronic Monitoring Conditions Agreement attached hereto as Exhibit A, the terms and conditions of which are incorporated herein by reference.

5. Defendant shall meet and/or communicate—directly or indirectly through others—only with his attorneys and individuals specifically designated and approved by the Court. A list of such approved persons is appended hereto as Exhibit C; this list may be modified by the Court from time to time in response to requests from Defendant or the government. Pretrial services shall require the Defendant to keep a written record, subject to inspection at any time, of his direct and indirect communications to monitor this provision. Failure to record each and every communication shall constitute a violation of this provision. In addition, the Defendant, at his own expense, shall install and maintain video cameras at each entrance to his house. The video cameras shall operate to record everyone entering or leaving on a 24 hour basis. Additionally, except as provided in this paragraph, or with the consent of Pretrial Services, Defendant shall not acquire, install or maintain any video, closed-circuit or other surveillance cameras at or directed at his residence, driveway or surrounding property. Procedures relating to the operation of the videotaping equipment and custody of the tapes generated shall be established by Pretrial Services.

6. There shall be only one telephone and one telephone line at 478 Angell Road, Lincoln, Rhode Island. No cellular telephone or other means of wire or electronic communication is permitted.

7. Prior to his release, Defendant shall execute an Agreement to Forfeit and any necessary related documents, in a form satisfactory to the Court, authorizing the

Court to forfeit up to $4,000,000 worth of property to be pledged in connection with his release if the Court determines that he has violated any condition of his release. This agreement shall be collateralized by the property listed in Exhibit D hereto. Also prior to Defendant's release, all individuals with any interest in such property shall be furnished with a copy of the Court's June 21, 1991 decision in this matter and this Order. Each such individual shall execute an Agreement to Forfeit, substantially in the form attached hereto as Exhibit E, and any necessary related documents recognizing the authority of the Court to forfeit such property if the Defendant violates any condition of his release, including but not limited to the requirements that the Defendant appear as directed in the future, not commit any crimes while on release, and not communicate directly or indirectly with anyone not listed on Exhibit C hereto.

8. Defendant shall also:

a. refrain from possessing a firearm, destructive device, or other dangerous weapon.

b. refrain from the excessive use of alcohol or the use of any narcotic drug unless prescribed by a physician.

c. Surrender any passport.

d. Obtain no passport.

e. Abide by any other condition consistent with the purposes of this Order which Pretrial Services deems appropriate.

9. The Defendant is hereby advised of the penalties and sanctions relating to the violation of any of the foregoing conditions which are described on Exhibit B hereto. Defendant's attention is particularly directed to the requirement that he not personally, or with or through others, seek to intimidate a witness or otherwise obstruct justice.

10. Defendant shall sign a document acknowledging that he is aware of the conditions of his release; promising to obey those conditions, to appear as directed, and to surrender to serve any sentence imposed; and confirming his awareness of the penalties and sanctions described on Exhibit B hereto. Defendant is particularly reminded that a violation of any condition of his release may result in the enhancement of any sentence ultimately imposed in this case, and also constitute a separate, prosecutable and punishable federal offense.

11. As Defendant has previously agreed, Defendant and his residence shall be subject to unannounced searches by agents or officers of the Federal Bureau of Investigation, Pretrial Services, or by other law enforcement agencies acting with the prior approval of either the Federal Bureau of Investigation or Pretrial Services. Searches shall include the property and persons of individuals at Defendant's residence. The Defendant shall execute a Consent to Search form attached hereto as Exhibit F. Each person listed on Exhibit C hereto, or subsequently added thereto, shall execute a Consent to Search in the form attached hereto as Exhibit G prior to his or her first visit to Defendant's resident; absent such an agreement, no visitation is authorized.

12. If Pretrial Services has reason to believe that Defendant is absent from his residence without its authorization, Pretrial Services shall promptly inform the Federal Bureau of Investigation and the United States Marshal Service in Massachusetts and/or Rhode Island. Upon receipt of such notice from Pretrial Service, the Federal Bureau of Investigation and the United States Marshal Service are hereby authorized and ordered, pursuant to 28 U.S.C. § 1651, to take all measures appropriate to a fugitive investigation including, but not limited to arresting and detaining Defendant for the purpose of bringing him before a magistrate-judge or a Court or competent jurisdiction in accordance with the provisions of Rule 5 of the Federal Rules of Criminal Procedure.

## EXHIBIT A

### United States District Court
### District of Massachusetts
### U.S. Pretrial Services Office

### Electronic Monitoring Conditions

I, _____Raymond J. Patriarca_____, Case No. _89-289-WF_, understand that I have been placed in the electronic monitoring program as a condition of my pretrial release. I further acknowledge that I will comply with the rules of this program as well as any additional conditions set by the Court as requirements for my pretrial release.

I shall reside at __478 Angell Road, Lincoln, RI 02865__, telephone number __401-353-8491__, until I receive permission of the Court to change my residence.

I acknowledge the following conditions:

1. only one and one telephone line
 I must have ∧ telephone∧ at my residence and provide the Pretrial Services Office with a copy of my phone bill each month. I understand that I may not have special phone services/equipment (i.e. call waiting, call forwarding, answering machine, cordless phone, etc.) and may not alter or cause to be altered in any way my telephone equipment and wiring.

2. I̶ ̶w̶i̶l̶l̶ ̶p̶r̶o̶v̶i̶d̶e̶ ̶m̶y̶ ̶P̶r̶e̶t̶r̶i̶a̶l̶ ̶S̶e̶r̶v̶i̶c̶e̶s̶ ̶O̶f̶f̶i̶c̶e̶r̶ ̶w̶i̶t̶h̶ ̶a̶n̶ ̶i̶t̶i̶n̶e̶r̶a̶r̶y̶ ̶o̶f̶ ̶m̶y̶ ̶s̶c̶h̶e̶d̶u̶l̶e̶ ̶a̶n̶d̶ ̶n̶o̶t̶ ̶d̶e̶v̶i̶a̶t̶e̶ ̶f̶r̶o̶m̶ ̶i̶t̶ ̶w̶i̶t̶h̶o̶u̶t̶ ̶a̶p̶p̶r̶o̶v̶a̶l̶. I understand that I am required to remain at the above address at all times unless granted prior approval by the Pretrial Services Officer in the following circumstances:
 Medical appointments with prior approval of Pretrial Services given 24 hours in advance and/or medical emergencies subject to permission by Pretrial Services. Presence of attorneys is required as detailed in paragraph 3 of P̶r̶o̶p̶o̶s̶e̶d̶ Order Regarding Conditions of Release

3. In the event of an emergency, I will attempt to notify Pretrial Services at __617-223-9213 or 617-789-1609__ prior to leaving the above address. I will contact Pretrial Services immediately about this emergency upon the earliest opportunity. I will be expected to provide documented proof of the emergency. I will follow the procedures outlined in paragraph 3 of the Proposed Order

4. I will provide Pretrial Services with c̶o̶p̶i̶e̶s̶ ̶o̶f̶ ̶p̶a̶y̶c̶h̶e̶c̶k̶ ̶s̶t̶u̶b̶s̶, medical a̶n̶d̶ ̶d̶e̶n̶t̶a̶l̶ appointment verifications and such other documentation as may be required.

5. I understand that to insure compliance with the program

I will be monitored by ~~a tamper-proof non-removable~~ ankle bracelet which I agree to wear 24 hours a day during the entire period of my participation. I understand that this monitoring will be accomplished by a receiver attached to my residence telephone connected electronically by common carrier to a computer at Guardian Techhologies, Inc. I may also receive random telephone calls and personal visits by a Pretrial Services Officer to which I agree to respond as directed.

6. I agree to notify Pretrial Services immediately of telephone or equipment failure.

7. I acknowlege that the loss of a receiving signal, the receipt of a tamper signal, or the receipt of a signal indicating absence from the residence, is evidence of a violation. Physical evidence indicating the monitoring device has been tampered with is a violation. I agree that a violation determined by the monitoring equipment will be considered evidence of a bail violation and a computer printout will be used as evidence in a violation hearing.

8. I agree to hang up the telephone immediately when I hear a clicking sound caused by the receiver/dialer. I will inform my caller that I will call back in five minutes. My family and I agree to limit calls to five minutes and leave the telephone open for five minutes between each call. In no case will the telephone be taken off the hook.

9. I realize that it will be necessary for the monitoring device to be attached to my residence telephone and that it will be necessary during the period of this program for Pretrial Services Officers to maintain or inspect this equipment as they determine necessary.

10. I understand that I will be held responsible for any damage, other than normal wear, to the equipment installed in my residence. If I do not return the equipment, or do not return it in good condition, I will be charged for its replacement or repair. I further understand that the United States and Guardian Technologies, Inc. are not liable for any damage incurred as a result of my wearing or tampering with the monitoring device.

11. The charges incurred for telephone calls from my residence phone and the expenses incurred for electricity used to monitor my participation shall be paid by me.

12. I understand that I cannot go beyond 150 feet from the receiver (telephone) or a violation will be detected. Additionally, I must stay within the residence of 478 Angell Road, Lincoln, Rhode Island.

13. Additional conditions/instructions:_____
 The defendant shall comply with all conditions of release.
 _____
 _____
 _____
 _____
 _____

I have read or had read to me the above and have been given an opportunity to request claification from the Pretrial Services Officer. I understand the procedures I am to follow. I understand that if I should violate any of these terms it shall be deemed a violation of my pretrial release and I shall be subject to arrest and return to court as a violator subject to additional penalties. I fully understand these rules and I will abide by them.

_____ _____
Defendant/Date Pretrial Services Officer/Date

## Advice of Penalties and Sanctions

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 U.S.C. §3148, and a prosecution for contempt as provided in 18 U.S.C. §401 which could result in a possible term of imprisonment or a fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not less than two years nor more than ten years, if the offense is a felony; or a term of imprisonment of not less than ninety days nor more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself.

18 U.S.C. §1503 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 U.S.C. §1510 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to obstruct a criminal investigation; 18 U.S.C. §1512 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to tamper with a witness, victim or informant; and 18 U.S.C. §1513 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to retaliate against a witness, victim or informant, or threaten or attempt to do so.

It is a criminal offense under 18 U.S.C. §3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction, for:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more, the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;
(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;
(3) any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;
(4) a misdemeanor, the defendant shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted.

## Acknowledgement of Defendant

I acknowledge that I am the defendant in this case and that I am aware of the conditions of release. I promise to obey all conditions of release, to appear as directed, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions set forth above.

_____
Signature of Defendant

_____
Address

_____
City and State Telephone

## Directions to United States Marshal

( ) The defendant is ORDERED released after processing.
( ) The United States marshal is ORDERED to keep the defendant in custody until notified by the clerk or judicial officer that the defendant has posted bond and/or complied with all other conditions for release. The defendant shall be produced before the appropriate judicial officer at the time and place specified, if still in custody.

Date: _____ _____
 Signature of Judicial Officer

 _____
 Name and Title of Judicial Officer

WHITE COPY — COURT YELLOW — DEFENDANT BLUE — U.S. ATTORNEY PINK — U.S. MARSHAL

EXHIBIT C

LIST OF PERSONS AUTHORIZED
TO VISIT DEFENDANT

Eluterio and Marie Patriarca (cousins)

Rita Patriarca (stepmother)

Dr. and Mrs. (JoAnn) David Vito (cousins)

Anthony and Mary Jane Di Maio (cousins)

Grace Antonelli (aunt)

Gertrude Hutter (aunt)

Augustine Del Farno (neighbor)

Thomas Del Farno (neighbor)

Jock Calafrancesco (accountant)

Arnold Kilberg (accountant)

Christopher Patriarca (son)

Barbara Patriarca (wife)

ATTORNEYS:

Marin Weinberg

Joseph Oteri

John Cicilline

Vincent Oddo

Laura Pearce

Joseph Patriarca

EXHIBIT D
PROPERTY LIST

| Owner | Address | Value | Liens/Mortgages |
|---|---|---|---|
| Mrs. Grace Antonelli | 1 Haterly Street N. Providence, RI | $ 44,210 | none |
| Dr./Mrs. David Vito | 169 Sandringham Avenue Providence, RI 02908 | $ 179,700 | $9,524.33 mgt |
| Dr./Mrs. Anthony DiMaio | 15 Windward Drive Westerly, RI | $ 272,400 | $33,000 mgt $100,000 (equity loan) |
| " | Land in Connecticut | $ 20,160 | |
| Mr./Mrs. Eluterio R. Patriarca | 1 Villa Drive N. Providence, RI 02911 | $ 210,000 | $100,000 (equity loan) |
| Mrs. Barbara Patriarca | 478 Angell Road Lincoln, RI 02865 | $ 675,000 | |
| Rita Patriarca | 18 Golini Drive Johnston, RI 02919 | $ 160,000 | |
| " | 136 Indian Trail Wakefield, RI 02879 | $ 250,000 | |
| 82 Corporation 40 Agnes Street Providence, RI 02909 | Kendall Estates Lincoln, RI 02865 | $1,770,000 | |
| " | Kendall Estates Lincoln, RI 02865 | $1,050,000 | |

EXHIBIT E

AO 98 (Rev. 8/85) Appearance Bond ⊕

# United States District Court

―――――――――――――――――― DISTRICT OF ――――――――――――――― ―――――

UNITED STATES OF AMERICA
V.

**BOND**

_____
Defendant

CASE NUMBER.

Non-surety: I, the undersigned defendant acknowledge that I and my . . .
Surety: We, the undersigned, jointly and severally acknowledge that we and our . . .
personal representatives, jointly and severally, are bound to pay to the United States of America the sum of
$ _____, and there has been deposited in the Registry of the Court the sum of
$_____ in cash or _____(describe other security.)

The conditions of this bond ᴀᴘᴇ that the defendant include the requirement _____
 (name)
is to appear before this court and at such other places as the defendant may be required to appear, in accordance
with any and all orders and directions relating to the defendant's appearance in this case, including appearance for
violation of a condition of defendant's release as may be ordered or notified by this court or any other United
States District Court to which the defendant may be held to answer or the cause transferred. The defendant is
to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying
any order or direction in connection with such judgment.
The conditions of this bond also include the requirements described on Exhibit 1 hereto.
It is agreed and understood that this is a continuing bond (including any proceeding on appeal or review)
which shall continue until such time as the undersigned are exonerated.

If the defendant appears as ordered or notified and otherwise obeys and performs the foregoing conditions of
this bond, then this bond is to be void, but if the defendant fails to obey or perform any of these conditions, pay-
ment of the amount of this bond shall be due forthwith. Forfeiture of this bond for any breach of its conditions may
be declared by any United States District Court having cognizance of the above entitled matter at the time of such
breach and if the bond is forfeited and if the forfeiture is not set aside or remitted, judgment may be entered upon
motion in such United States District Court against each debtor jointly and severally for the amount above stated,
together with interest and costs, and execution may be issued and payment secured as provided by the Federal
Rules of Criminal Procedure and any other laws of the United States.

This bond is signed on _____ at _____ .
 Date Place
Defendant. _____ Address. _____

Surety. _____ Address. _____

Surety. _____ Address. _____

Signed and acknowledged before me on _____
 Date

_____
Judicial Officer/Clerk

Approved: _____
 Judicial Officer

**618**

AO 98 (Rev. 8/85)

## JUSTIFICATION OF SURETIES

I, the undersigned surety, say that I reside at _____

_____ ; and that my net worth is the sum of

_____ dollars ($_____).

I further state that

_____
Surety

Sworn to before me and subscribed in my presence on _____
Date

at _____
Place

_____ _____
Name and Title Signature of Judicial Officer Clerk

I, the undersigned surety, state that I reside at _____

_____ ; and that my net worth is the sum of

_____ dollars ($_____).

I further state that

_____
Surety

Sworn to before me and subscribed in my presence on _____
Date

at _____
Place

_____ _____
Name and Title Signature of Judicial Officer/Clerk

Justification Approved:_____
Judicial Officer

### Exhibit 1

The conditions of this bond also include the requirement that the Defendant obey each and every of the conditions of his release stated in the Order dated July 1, 1991. Each of the undersigned represents that he or she has read that Order and is familiar with the related Opinion of the Court rendered on June 21, 1991. Each of the undersigned expressly recognizes and agrees, among other things, that the property hereby pledged to secure Defendant's release shall be forfeitable if the Defendant violates any condition of his release, including but not limited to the requirements that he appear in Court as directed,

not commit any crimes while on release, and not communicate directly or indirectly through others with anyone not listed on Exhibit C to the Order dated July 1, 1991.

### EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CRIMINAL NUMBER 89–289–WF |
| | ) | |
| RAYMOND J. PATRIARCA | ) | |

#### CONSENT TO SEARCH

I, Raymond J. Patriarca, in consideration of my release from pretrial detention in the above-captioned case, hereby consent to the search of any and all persons or property located at 478 Angell Road, Lincoln, Rhode Island by agents or officers of the Federal Bureau of Investigation, Federal Pretrial Services, or by other federal, state or local law enforcement agencies with the prior approval of the Federal Bureau of Investigation or Pretrial Services, during the pendency of the above-captioned case.

Furthermore, I waive any and all objections to the introduction into evidence against me of any items seized pursuant to such searches at any future criminal proceedings, including but not limited to a hearing on a motion to revoke my release, provided however that I reserve the right to object to the introduction into evidence against me of any item(s) if I can establish at any such proceeding that the item(s) was/were seized pursuant to a search that was not conducted pursuant to the authority granted in this Court's order of release dated July 1, 1991.

_____ _____
RAYMOND J. PATRIARCA DATE

### EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CRIMINAL NUMBER 89–289–WF |
| | ) | |
| RAYMOND J. PATRIARCA | ) | |

#### CONSENT TO SEARCH

I, _____, in consideration of the release from pretrial detention of Raymond J. Patriarca in the above-captioned case, hereby consent to the search of my person and/or any and all of my property any time I am on the premises located at 478 Angell Road, Lincoln, Rhode Island by agents or officers of the Federal Bureau of Investigation, Federal Pretrial Services, or by other federal, state or local law enforcement agencies with the prior approval of the Federal Bureau of Investigation or Pretrial Services, during the pendency of the above-captioned case.

Furthermore, I waive any and all objections to the introduction into evidence against me of any items seized pursuant to such searches at any future criminal proceedings, provided however that I reserve the right to object to the introduction into evidence against me of any item(s) if I can establish at any such proceeding that the item(s) was/were seized pursuant to a search that was not conducted pursuant to the authority granted in this Court's order of release dated July 1, 1991.

_____ _____
SIGNATURE DATE

_____
PRINT NAME